On Balbino Investments, LLC’s Motions for Rehearing

ROTHENBERG, J.
The City of Miami (“City”) and Balbino Investments, LLC (“Balbino”) filed motions for Rehearing and Rehearing En Banc. The City subsequently withdrew its motions. Balbino’s Motion for Rehearing is denied. We, however, withdraw this Court’s opinion issued on August 8, 2007, and issue the following opinion in its stead to address the dissenting opinion to the denial of the Motion for Rehearing En Banc.
Balbino owns a parcel of land located on the north side of the Miami River at approximately N.W. 18th Avenue, Miami, Florida, and which was being used as a commercial boatyard and marina. Balbino applied for and obtained from the City a small scale amendment to the Future Land Use Map (“FLUM Amendment”) of the Miami Comprehensive Neighborhood Plan (“Comprehensive Plan”), changing the land use designation of the property from Industrial and General Commercial to Restricted Commercial. Balbino also applied for and obtained a zoning change from SD-4.2 Waterfront Industrial to C-l Restricted Commercial and a Major Use Special Permit (“MUSP”), thereby allowing Balbino to construct a multi-family development project with a maximum density of 150 units per acre on the property. The ordinance approving the FLUM Amendment, Ordinance No. 12550, was adopted *711 by the City Commission on June 24, 2004. The City approved the rezoning of the property and the MUSP on the same day. The approved development on this waterfront parcel is for three high-rise buildings consisting of 1,073 condominium units with a median price of $200,000 to $225,000 per unit.
The following parties filed a petition with the Division of Administrative Hearing (“DOAH”), challenging the ordinance that approved the - FLUM Amendment: Herbert Payne (“Payne”), a boat captain who owns and operates one of the largest tugboat companies on the Miami River and who relies exclusively on commercial marine business on the Miami River for his livelihood; Ann Stetser, a local resident; The Durham Park Neighborhood Association, Inc. (“Durham Park”), a non-profit neighborhood association composed of approximately ninety homeowners and businesses located in the Durham Park area, which is located across the Miami River and to the west of Balbino’s property; and The Miami River Marine Group, Inc. (“Marine Group”), a trade association representing marine and industrial businesses along the Miami River (collectively, “the appellants”). This petition was dismissed as untimely filed. On appeal, this Court reversed and remanded, finding that the petition was timely filed. Payne v. City of Miami, 913 So.2d 1260 (Fla. 3d DCA 2005) {“Payne 7”).
Meanwhile, the circuit court dismissed Marine Group from the petition, finding that it lacked standing. That decision, which will be addressed more fully in this opinion, was also reversed by this Court in Payne v. City of Miami, 927 So.2d 904 (Fla. 3d DCA 2005) (“Payne II).
On remand, the appellants sought leave to amend the petition to include arguments regarding additional provisions contained in the Comprehensive Plan. Balbino objected, arguing that the provisions the appellants sought to include pertained to land development regulations, and therefore, did not apply to the challenged FLUM Amendment which pertains to land use. The administrative law judge (“ALJ”) agreed with Balbino, and he denied the appellants’ motion for leave to amend the petition with allegations arising from those provisions. After a hearing, the ALJ issued a Recommended Order, which was subsequently adopted by the State of Florida Department of Community Affairs (“the Department”), and to which the appellants now appeal.
Because the appellants are challenging agency action, our review is governed by section 120.68, Florida Statutes (2006), and Coastal Development of North Florida, Inc. v. City of Jacksonville Beach, 788 So.2d 204 (Fla.2001). The relevant provisions of section 120.68 provide:
(7) The court shall remand a case to the agency for further proceedings consistent with the court’s decision or set aside agency action, as appropriate, when it finds that:
(a) There has been no hearing prior to agency action and the reviewing court finds that the validity of the action depends upon disputed facts;
(b) The agency’s action depends on any finding of fact that is not supported by competent, substantial evidence ...;
(c) The fairness of the proceedings or the correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure;
(d) The agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action; or
*712 (e) The agency’s exercise of discretion was:
1. Outside the range of discretion delegated to the agency by law;
2. Inconsistent with agency rule;
3. Inconsistent with officially stated agency policy or a prior agency practice, if deviation therefrom is not explained by the agency; or
4. Otherwise in violation of a constitutional or statutory provision[.]
(Emphasis added).
Amendments to a local government’s comprehensive plan are legislative in nature and, therefore, are subject to the fairly debatable standard of review. Martin County v. Yusem, 690 So.2d 1288, 1295 (Fla.1997). Thus, where reasonable persons could differ as to the propriety of the planning action, it should be affirmed. Id.; see also Coastal Dev., 788 So.2d at 206 (applying the fairly debatable standard of review to small scale development amendments). However, because the future land use map of a comprehensive plan represents a local government’s fundamental policy decisions, any proposed change to that established policy is a policy decision that requires that those policies be reexamined. Coastal Dev., 788 So.2d at 209.
It seems to us that all comprehensive plan amendment requests necessarily involve the formulation of policy, rather than its mere application. Regardless of the scale of the proposed development, a comprehensive plan amendment request will require that the governmental entity determine whether it is socially desirable to reformulate the policies previously formulated for the orderly future growth of the community. This will, in turn, require that it consider the likely impact that the proposed amendment would have on traffic, utilities, other services, and future capital expenditures, among other things.
Id. at 209 (quoting with approval City of Jacksonville Beach v. Coastal Dev. of N. Fla., Inc., 730 So.2d 792, 794 (Fla. 1st DCA1999)).
In applying these standards, the City Commission recognized: the importance of the Miami River to the marine industry and the City; the need to strike a balance between supporting and protecting this valuable resource; that each conversion from industrial to residential use on the river increases the pressure on land owners who support the marine industry; that a moratorium on the river should be instituted in order to properly address and develop a comprehensive plan on how development should proceed on the river; and that the City was “bordering upon letting the development on the Miami River get out of control,” and the “need to apply the brakes to this before it happens.” Nonetheless, the City Commission approved this FLUM Amendment without addressing the fundamental policy considerations and ramifications of its decision, leaving consideration of these issues for another day.
After performing a careful and thorough review of the record, we conclude that reversal of the “agency’s action” is required for failure to comply with the requirements of section 120.68. Specifically, many of the ALJ’s findings are unsupported by competent substantial evidence; the ALJ incorrectly interpreted the law and failed to follow existing law; and the ALJ failed to examine the FLUM Amendment’s impact on and consistency with other fundamental policy decisions contained in the Comprehensive Plan and the Miami River Master Plan. We additionally conclude that had the correct law been applied to the facts that are supported by competent substantial evidence, it would compel a finding that the Balbino FLUM Amend *713 ment is inconsistent with both the Comprehensive Plan and the Miami River Master Plan.
STATUTORY REQUIREMENTS
Section 163.3161, Florida Statutes (2004), which is known as the Local Government Comprehensive Planning and Land Development Regulation Act, was enacted to strengthen local governments’ role in the establishment and implementation of comprehensive planning to control future development. Section 163.3161 provides, in part:
(5) It is the intent of this act that adopted comprehensive plans shall have the legal status set out in this act and that no public or private development shall be permitted except in conformity with comprehensive plans, or elements or portions thereof, prepared and adopted in conformity with this act.
(7) The provisions of this act in their interpretation and application are declared to be the minimum requirements necessary to accomplish the stated intent, purposes, and objectives of this act; to protect human, environmental, social, and economic resources; and to maintain, through orderly growth and development, the character and stability of present and future land use and development in this state.
(Emphasis added).
Section 163.3177(2) provides in pertinent part that “[t]he several elements of the comprehensive plan shall be consistent, and the comprehensive plan shall be financially feasible ...” Additionally, section 163.3177(6), provides that the comprehensive plan shall include certain elements, including:
(a) A future land use plan element designating proposed future general distribution, location, and extent of the uses of land for residential uses, commercial uses, industry, agriculture, recreation, conservation, education, public buildings and grounds, other public facilities, and other categories of the public and private uses of land.... For coastal counties, the future land use element must encourage the preservation of recreational and commercial working waterfronts as defined in s. 342.07....
Amendments to the comprehensive plan may not be made more than two times during any calendar year except: (a) in the case of an emergency, (b) when the amendment is directly related to a proposed development of regional impact, or (c) if the amendment is for a small scale development. § 163.3187(l)(a)-(c), Fla. Stat. (2004). The Balbino FLUM Amendment was sought and granted as a small scale development pursuant to section 163.3187(l)(c).
Section 163.3187(l)(c), provides an exception to the time limitation for small scale amendments to comprehensive plans if:
1. The proposed amendment involves a use of 10 acres or fewer and:
f. If the proposed amendment involves a residential land use, the residential land use has a density of 10 units or less per acre, except that this limitation does not apply to small scale amendments described in sub-sub-sub-paragraph a.(l) that are designated in the local comprehensive plan for urban infill, urban redevelopment, or downtown revitalization as defined in s. 163.3164, urban infill and redevelopment areas designated under s. 163.2517, transportation concurrency exception areas approved pursuant to s. 163.3180(5), or regional activity centers and urban *714 central business districts approved pursuant to s. 380.06(2)(e).
Thus, before the Balbino small scale FLUM Amendment could be approved without complying with the requirements normally imposed, it was required to demonstrate that the amendment involved property that is ten acres or less and the proposed amendment involved a residential use with a density of ten units or less per acre or that the property is designated in the Comprehensive Plan as urban infill, urban redevelopment, or downtown revitalization.
We note that the ALJ and the City incorrectly applied the 2005 version of this statute.[1] The density exception does not apply as the density for the proposed development is over ten units per acre, and the current Industrial classification, which pertains to nearly all of the property contained in this small scale FLUM Amendment, permits no residential uses. Thus, the exception the Balbino FLUM Amendment relies on is that the subject property is located in an urban infill zone. The Amendment is able to rely on the “urban infill” exception because the City has declared the entire City an urban infill site, and is thus able to bypass obtaining State approval and State oversight for all small scale amendments to its Future Land Use Map.
In addition to the statutes regulating land use, requiring the enactment of comprehensive planning to control future development and providing a regulatory scheme for amendments to comprehensive plans, is the City’s Zoning Code.
THE CITY’S ZONING CODE
Article 6 of the City of Miami Zoning Code (2004) (“City’s Zoning Code”) provides for the creation of SD Special Districts to protect certain areas or districts within the City. Article 6, Section 600, provides in pertinent part as follows:
Section 600. Intent.
It is the intent of these regulations to permit creation of SD Special Districts:
(a) In general areas officially designated as having special and substantial public interest in protection of existing or proposed character, or of principal views of, from, or through the areas[.]
It is further intended that such districts and the regulations adopted for them shall be in accord with, and promote the policies set out in, the Miami Comprehensive Neighborhood Plan and other officially adopted plans in accordance therewith.
City of Miami Zoning Code, Art. 6, § 600 (emphasis added). “The regulations shall be designed to promote the special purposes of the district, as set out in the statement of intent.” Id. at § 600.4.3. Article 6, section 604 of the City’s Zoning Code specifically provides for the creation of a waterfront industrial district to regulate the waterfront property along the Miami River, and states, in pertinent part, as follows:
Sec. 604. SD-4 Waterfront Industrial District.
Sec. 604.1. Intent.
This district designation is intended for application in areas appropriately located for marine activities, including industrial operations and major movements of passengers and commodities. In view of the importance of such *715 activities to local economy and the limited area suitable and available for such activities, it is intended to limit principal and accessory uses to those reasonably requiring location within such districts, and not to permit residential, general commercial, service, office or manufacturing uses not primarily related to waterfront activities except for office uses in existing office structures. For the purposes of section 3(mm) of the City of Miami Charter, this district shall be construed as an industrial district.
Sec. 604.4. Principal uses and structures.

60U-U-1. Permitted principal uses and structures.

1. Piers, wharves, docks, and railroad service to related loading, storage or distribution facilities.
2. Freight terminals; facilities for warehousing and storage, packing, packaging and crating of materials from or for marine shipment; assembly and distribution facilities for marine shipments, except as provided under permitted uses and structures in section 604.4.2 below.
3. Passenger terminals, including related facilities for handling baggage or freight, ground transportation, parking, and establishments to serve needs of passengers and visitors including retail shops, eating and drinking establishments, ticket agencies, currency exchanges and the like.
4. Facilities for construction, maintenance, service, repair, supply or storage of vessels, including shipyards, dry docks, marine railways, shops for marine woodworking, electrical, communication and instrument installation and repair, welding, sail making, engine and motor repair and maintenance; ship chandlers; fuel supply establishments. Manufacture, maintenance, service, repair and/or sales or supply of parts, accessories and equipment for marine needs.
5. Bases for marine dredging, salvage, towing; marine construction offices and yards, piloting headquarters.
6. Sales, charter or rental of vessels, marine supplies and equipment, marine sporting goods and supplies.
7. Establishments for collection, processing and/or distribution or sales of marine food products and byproducts, including eating and drinking establishments related to such operations.
8. Hiring halls for seamen and dock workers.
9. Telecommunication transmission and relay stations; radar installation.
10. Structures and uses other than as listed above for performance of governmental functions (including private facilities supplementing or substituting for governmental functions such as fire protection or provision of security), or relating to operation of public utilities.
11. Commercial marinas, including permanent occupancy of private pleasure craft as living quarters and for temporary occupancy for transients (maximum stay: thirty (30) days) as shall be required for work or security purposes, or for repair work within the district.
12. Cellular communications site provided that where a transmission tower is used the transmission tower shall be by Special Exception only. The transmission tower and anchoring devices, if directly-abutting a residential district, must: (1) be located in the interior side or rear yard of the property; (2) meet minimum setback requirements; (3) be securely anchored, *716 installed and maintained in accordance with all applicable codes; (4) not exceed a maximum height of one hundred and fifty (150) feet; and (5) be separated from adjacent properties by a landscape buffer.
Despite section 163.3161(5), which prohibits development unless it is in conformity with the City’s Comprehensive Plan; section 163.3161(7), which specifies that the purpose of the Act is to protect certain resources and to maintain the character and stability of development in this state through orderly growth and development; section 163.3187, which limits amendments to the Comprehensive Plan; and Article 6 of the City’s Zoning Code, designating key areas on the Miami River within a protected district due to its importance to the City’s economy, a designation that specifically prohibits residential use or other uses not primarily related to waterfront activities, the City granted Balbino a small scale FLUM Amendment for its property located within this specially protected district, thereby allowing the construction of residential units that are not primarily related to waterfront activities. As will be addressed in depth herein, Balbino’s FLUM Amendment is contrary to these provisions and is inconsistent with the Miami Comprehensive Neighborhood Plan and the Miami River Master Plan.
THE MIAMI COMPREHENSIVE NEIGHBORHOOD PLAN
(“Comprehensive Plan”)
The ALJ found that the FLUM Amendment was consistent with the goals, objectives, and policies of the Comprehensive Plan. The ALJ’s evaluation of the evidence is, however, flawed because he failed to consider critical goals, objectives, and policies found in the “Port of Miami River,” “Coastal Management,” and “Future Land Use” sections of the Comprehensive Plan in reaching this conclusion. We will address each of these sections of the Comprehensive Plan separately.
A. The Port of Miami River Subelement
The Comprehensive Plan was adopted by the City Commission in 1989 and amended through August of 2004. Within the Comprehensive Plan is a section devoted to “Ports, Aviation and Related Facilities,” specifying the City’s goals, objectives, and policies regarding development within these critical areas. Within this section there is a subelement titled the “Port of Miami River.” The appellants claim that the Balbino FLUM Amendment is inconsistent with this subelement.
Although the appellants attempted to present evidence to substantiate their claim that the Balbino FLUM Amendment is inconsistent with the Port of Miami River subelement of the Comprehensive Plan, the ALJ precluded them from introducing evidence regarding this subelement because he incorrectly concluded it was not relevant. The ALJ based his conclusion, in part, on the Department’s definition of the term “Port of Miami River” in Monkus v. City of Miami, DOAH Case No. 04-1080 GM (Department of Community Affairs, Final Order, Oct. 28, 2004) (“Monkus ”), despite our contrary conclusion in Payne II. At the time of the hearing, the ALJ’s justification for failing to apply this Court’s holding in Payne II was that Payne II was still under consideration for rehearing and rehearing en banc. Although the appellants moved for a continuance pending the issuance of a mandate by this Court in Payne II, the ALJ denied the motion and precluded the appellants from introducing any evidence or making any argument regarding the Port of Miami River subelement of the Comprehensive Plan. The ALJ’s refusal to permit the ap *717 pellants to introduce evidence or present argument that the Balbino FLUM Amendment is inconsistent with the Port of Miami River subelement of the Comprehensive Plan was error.
The basis for the ALJ’s exclusion of this relevant evidence was his finding that the Port of Miami River subelement only relates to the fourteen commercial shipping companies that were located along the Miami River in 1989. The ALJ’s finding is premised on a footnote found in the Port of Miami River subelement of the Comprehensive Plan, which states:
The “Port of Miami River” is simply a legal name used to identify some 14 independent, privately-owned small shipping companies located along the Miami River, and is not a “Port Facility” within the usual meaning of the term. The identification of these shipping concerns as the “Port of Miami River” was made in 1986 for the sole purpose of satisfying a U.S. Coast Guard regulation governing bilge pump outs.
Based upon this footnote, the ALJ found, Balbino continues to argue on appeal, and the dissenting opinion issued by the members of this Court who voted to grant en banc review (“the dissent”) concludes that the policies and objectives regarding the Port of Miami River in the Comprehensive Plan only apply to those fourteen companies. This argument was, however, rejected by this Court in Payne II and by Balbino’s own witness, Lourdes Slazyk, the Assistant Director of the City’s Planning Department, a witness heavily relied on by the dissent. In Payne II this Court stated the following:
We find that the “Port of Miami River” subsection is not limited to 14 unidentified companies. Rather, the footnote explains that the “Port of Miami River” is not a port in the traditional sense of the word. Accordingly, appellants did not have to allege that they were one of the 14 shipping companies referenced in the footnote.
Payne, 927 So.2d at 908 (footnote omitted) (emphasis added). Ms. Slazyk, in fact, agreed with this Court’s definition of the Port of Miami River in Payne II and rejected the narrow definition relied on by the ALJ and the dissent.
The ALJ’s finding and Balbino’s argument, that the objectives and policies contained in the Port of Miami River subelement of the Comprehensive Plan do not apply to the Balbino property because it is not located on one of the original shipping company sites, is also illogical. First, it is undisputed that many of the fourteen shipping companies that were located at various sites along the Miami River in 1989 have moved, changed hands, or no longer exist, and that instead of fourteen shipping companies along the Miami River, there are now at least twenty-eight. Second, since the Comprehensive Plan’s enactment in 1989, the City adopted The Miami River Master Plan, which will be addressed more fully herein, and the City has amended and readopted the Comprehensive Plan. Third, it is also undisputed that the marine industry along the Miami River has grown substantially and has become an important economic asset to the City. The Miami River generates over $800 million in input, $427 million in income, $45 million in tax revenue per year, and provides employment to 7,500 people. The shipping industry along the Miami River is not only growing, further expansion is all but certain when the U.S. Army Corps of Engineers completes its dredging of the Miami River. It is, therefore, illogical to conclude that the City meant only to protect the original fourteen shipping companies along the Miami River when it drafted, enacted, amended and readopted the Comprehensive Plan. Thus, we reaffirm our *718 position in Payne II, that the “Port of Miami River” referred to in the Comprehensive Plan, and as amended and adopted in 2004, is not limited to the fourteen shipping companies that existed in 1989.
Our conclusion is supported by the findings contained in the Miami River Master Plan, prepared by the City of Miami Department of Planning, Building and Zoning, and adopted by the City on January 23, 1992, by Resolution # 92-61. In this document, the City recognized that, although the Miami River is a navigable waterway used extensively for commercial shipping, it is not officially regulated as a port by state or local government; these commercial shipping operations are 100% owned and operated by private enterprise and, therefore, do not enjoy the structure, authority, and advantages normally associated with ports; the name Port of Miami River was simply coined in 1986 to satisfy a U.S. Coast Guard regulation governing bilge pumpouts; and there are currently between twenty-five and thirty independent shipping companies operating on the Miami River as opposed to the fourteen companies operating in 1989. Miami River Master Plan, River Management, Port of Miami River, 2.12 (Jan.1992). Indeed, based upon this rather unusual structure, or lack thereof, the Miami River Master Plan stresses the need for a formal organization to manage the use of these facilities, providing, in part, as follows:
RECOMMENDATIONS
Policy:
2.4.9 Create an official “port” organization with responsibility to assist with enforcement of rales and regulations applicable to commercial shipping activity.
(a) Support the private sector efforts to fulfill the role of a port through a cooperative organization.
(b) If the private port cooperative fails to effectively manage shipping activity, establish a public port agency with legal authority to enforce regulations.
Id. at 2.13.
Additionally, the Miami River Corridor Infill Plan (“Infill Plan”) which will be addressed more fully in this opinion, contains a summary specifically addressing the Port of Miami River subelement. It reads as follows:
In 1988 The Port of Miami River consisted of approximately 14 independent shipping terminals, along the Miami River as shown in Figure IV-16, that were joined together in 1986 in order to comply with U.S. Coast Guard regulations regarding pumpout of bilge water.
The Infill Plan lists the fourteen original shipping terminals; discusses the services provided and the tonnage of cargo shipped; notes the estimated $1.7 billion value; and then addresses the Port of Miami River subelement as it existed in 1995:
As shown in Figure IV-19, in 1995 the Port of Miami River consists of about 28 independent shipping terminals located along navigable 5.5 miles of the Miami River that stretch from the salinity dam to the Biscayne Bay.
The Infill Plan names the twenty-eight shipping terminals that existed in 1995, which were considered the Port of Miami River at that time. While the Infill Plan does not provide a more current list of the Port of Miami River entities, its drafters make it clear that the term clearly includes the shipping terminals along the river wherever they are located and regardless of the name or ownership.
Our finding is further supported by the testimony of Jack Luft. Jack Luft, who testified for the appellants, was accepted *719 by the ALJ as an expert in the field of comprehensive land planning. Mr. Luft was a land planner with the City for twenty-eight years; participated in the rewrite of the Comprehensive Plan in 1978; was the senior project manager for several components of the Comprehensive Plan in the 1980’s; wrote master plans for various cities and areas, including Virginia Key, Dinner Key, Coconut Grove, downtown, Watson Island, Bicentennial Park, and a number of neighborhood revitalization parks; planned the Design District in the 1990’s; was a consultant for Sunny Isles Beach’s Comprehensive Master Plan in 2000; and is considered an expert for last year’s Comprehensive Plan. Additionally, Mr. Luft served as the Director for the Department of Development for the City and was involved in revitalization strategies for Little Havana and Little River, where he analyzed census information, income data, and housing costs and conditions to determine how to approach the revitalization of these communities.
Mr. Luft testified that the Port of Miami River is not specifically defined in the Comprehensive Plan, but rather, it is only “vaguely referred to as a collection of marine industries and nonspecific locations of an unspecific number.” It is Mr. Luft’s expert opinion that the Port of Miami River encompasses the marine industrial uses and properties along the Miami River, which include the shipping terminals, shipping operations, and an array of services including freight forwarders, port construction companies, repair facilities, equipment suppliers, and other entities that operate and service the vessels on the Miami River.
Dr. Francis Bohnsack, the Executive Director of the Miami River Marine Group and who serves as the Miami River Port Director for the United States Coast Guard as a liaison for the marine industry on the Miami River with local, state, and federal agencies, agrees with Mr. Luft’s definition of the Port of Miami River. Dr. Bohnsack explained that the Miami River Marine Group was established because of the Port of Miami River’s unconventional structure. While conventional ports have an operational infrastructure owned by the government, the Port of Miami River is composed of privately owned companies that compete with each other. The Miami River Marine Group was established as an independent; entity to serve its interests and the interests of the marine industry. She further explained that the Port of Miami River is a “riverine port” with many terminal addresses running along the entire length of the Miami River in designated marine industrial sites. It is, therefore, the position of both Mr. Lutz and Dr. Bohnsack that the Port of Miami River includes the port facilities that are water-dependent, zoned SD-4, and regulated by the Coast Guard, customs, and the various federal, state and local agencies.
Based on this Court’s ruling in Payne II and the testimony of the witnesses, including Balbino’s own witness, the ALJ clearly erred in finding that the Port of Miami River subelement did not apply to Balbi-no’s property because it is not the site of one of the shipping companies located on the Miami River in 1989. We also conclude that the evidence presented supports Mr. Luft’s and Dr. Bohnsack’s conclusions that the Port of Miami River subelement encompasses the water-dependent and water-related marine industries on the river, which includes the shipping companies, shipping terminals, and the associated supporting marine industries zoned SD-4 on the Miami River. Thus, the ALJ erred in refusing to permit the appellants to introduce evidence or to argue that Balbino’s FLUM Amendment is inconsistent with the objectives and policies of the Port of Miami River subelement and by failing to *720 consider the relevant objectives and policies contained in the Port of Miami River subelement.
Balbino and the dissent attempt to dismiss, or in the alternative, to minimize the ALJ’s refusal to apply this Court’s holding in Payne II during the hearing by arguing that because the ALJ ultimately “recognized” this Court’s holding in Payne II in his Recommended Order, the error was cured. We reject this argument. “Recognizing” the error without providing the appellants with an opportunity to present relevant evidence and make critical arguments regarding the FLUM Amendment’s impact on and inconsistency with the Port of Miami River subelement of the Comprehensive Plan does not cure the error. Furthermore, even after “recognizing” this Court’s holding in Payne II, the ALJ still refused to apply the goals, policies, and objectives of this subelement. This too was error.
Some of the objectives and policies found in the Port of Miami River subelement of the Comprehensive Plan that the ALJ failed to consider when he found that the FLUM Amendment was consistent with the Comprehensive Plan are:
Objective PA-3.1: The City of Miami, through its Land development regulations, shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and shall regulate its expansion and redevelopment in coordination with the City’s applicable coastal management and conservation plans and policies.
Policy PA-3.1.1: The City shall use its land development regulations to encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses.
Policy PA-3.1.2: The City shall, through its land development regulations, encourage the development and expansion of the Port of Miami River consistent with the coastal management and conservation elements of the City’s Comprehensive Plan.
Policy PA-3.1.3: The City shall, through its land development regulations, encourage development of compatible land uses in the vicinity of the Port of Miami River so as to mitigate potential adverse impacts arising from the Port of Miami River upon adjacent natural resources and land uses.
Policy PA-3.3.1: The City of Miami, through its Intergovernmental Coordination Policies, shall support the functions of the Port of Miami River consistent with the future goals and objectives of the Comprehensive Plan, particularly with respect to the unique characteristics of the Port of Miami River’s location and its economic position and functioning within the local maritime industry, and the necessity for coordination of these characteristics and needs with the maritime industry that complements, and often competes with, the Port of Miami River.
Failure to consider these objectives and policies is material, as Balbino’s proposed land use is clearly inconsistent with the Port of Miami River subelement of the Comprehensive Plan. Objective PA-3.1 requires the City to “protect the Port of Miami River from encroachment by non water-dependent or water-related land uses ....” (emphasis added). This su-belement also provides clear policy which requires the City through its land development regulations to encourage the maintenance of water-dependent and water-related uses along the banks of the Miami River and to encourage expansion of the Port of Miami River. Contrary to *721 these objectives and policies, the City approved Balbino’s small scale FLUM Amendment to the Comprehensive Plan, changing the land use designation, which is mostly Industrial, to Restricted Commercial, and also permitted this parcel of land, located directly on the Miami River, to be rezoned from SD-4.2 Waterfront Industrial to Restricted Commercial, thereby allowing the construction of a mixed-use project that is neither water-dependent nor water-related and will limit future expansion of the Port of Miami River.
Balbino and the City argue that the Port of Miami River subelement only applies to land development regulations (zoning), and not to land use, which is what the FLUM Amendment addresses. Balbino and the City, therefore, argue that regardless of how we define the Port of Miami River, the ALJ did not err in refusing to consider whether Balbino’s FLUM Amendment was consistent with the objectives and policies of the Port of Miami River subelement. The dissent agrees with this finding and further claims that the only issue before the ALJ was “the City’s legislative decision to reformulate its policy ... regarding this change. Because no land development, that is, zoning issues were involved, the ALJ properly refused to consider those parts of this sub-element.” (Emphasis added).
The dissent also argues that “Planning is not zoning and changing the Plan does not automatically result in changing the zoning ... zoning follows planning ... planning is not affected by zoning ... a new use designation does not mean that the rezoning request will or must be granted ... and the fact that this parcel of property is zoned SD-4.2, is wholly irrelevant as to whether changing the land use designation of this property from Industrial to Restricted Commercial is consistent with the Port of Miami River sub-element.” These arguments, however ignore the fact that Policy PA-3.3.1 does not address land development regulations and is clearly relevant when considering a land use amendment, and also disregards the record in this case.
The Balbino property was, for the most part, zoned SD-4.2 Waterfront Industrial. Therefore, its land use designation was, by necessity, identified as Industrial. The Industrial land use, coupled with the SD-4.2 land development classification, precludes any residential uses. The Industrial land use and the SD-4.2 land development classifications were placed on this property to reserve and preserve it as a water-dependent or water-related Industrial use that could not be used for residential purposes. The Port of Miami River subelement was enacted to specifically protect the shipping industry by “encourage[ing] and main-tainting] the water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses.” Policy PA-3.1.1. By changing the land use designation from Industrial to Restricted Commercial, the only water-related or water-dependent use permitted in that classification would be for a marina. More importantly, the FLUM Amendment will permit residential use, a land use specifically precluded by the SD-4.2 land development classification. Thus, by changing the land use, the FLUM Amendment dramatically changes the permitted land development uses, and limits the specifically designated sites reserved by the City to support the shipping industry on the Miami River.
While we agree with the dissent that land use planning and zoning are separate issues which generally must be considered separately, even when amendments to both are presented together, we conclude that because both requests were tied together, dependent on the other, and the zoning *722 amendment was the driving force and was essential to obtaining the land use amendment, the zoning amendment cannot be ignored in this case.
The record reflects that Balbino’s applications to the City to change the Comprehensive Plan by amending the Future Land Use Map from Industrial and General Commercial to Restricted Commercial, and to change the zoning from SD-4, Waterfront Industrial to C-l Restricted Commercial, were presented together, defendant on the other for approval, and approved together. In fact, an honest reading of the City’s minutes of the hearing reflects that the land use amendment (the FLUM Amendment) and the land development amendment (the zoning amendment) were approved because the Commissioners liked the project (1,073 condominium units consisting of three highrise buildings), not because the City made a “legislative decision to reformulate its policy,” as the dissent claims. In fact, the land use (FLUM Amendment) was approved for the specific purpose to allow the proposed development.
Chairman Teele: ... I really do think ... the whole issue of the Commission sitting in the zoning role is really to determine what the uses of land will be....
[[Image here]]
Chairman Teele: ... I’m going to support this project because I think ... this project is a handsome project, and I am persuaded ... that [the] community [is] crying out for residential opportunities and residential values....
The transcript of the hearing before the ALJ also reveals that Lourdes Slazyk, the Assistant Director of the City’s Planning Department, a witness called by Balbino and heavily relied on by the dissent, confirmed that the applications for the land use and the zoning (land development)
were tied together and that the City Commission would not approve one without approving the other. She testified that Balbino submitted all of its applications together in a “book”: its applications for a major use special permit, a land use amendment, and a land development amendment, and confirmed that the “zoning ordinance allows them to travel as companions.” The relevant testimony by Ms. Slazyk is as follows:
[Ms. Slazyk]: ... The ultimate recommendation is made by the planning director, but she takes into consideration the analysis prepared by the land development section....
[[Image here]]
[Ms. Slazyk]: ... zoning ordinance allows — when a project is the scale of a major use special permit, our zoning ordinance allows all of the subordinate reviews and approvals to be considered at the same time. They can file it all together.
[Counsel for appellants]: Meaning the land use amendment, the zoning?
[Ms. Slazyk]: And any other variances, any other subordinate special permits. [Counsel for appellants]: The whole bucket of stuff.
[Ms. Slazyk]: The major use is seen as the umbrella that covers all of the subordinate reviews and approvals....
When asked if either the land use amendment or the zoning amendment could be approved without approving the other, Ms. Slazyk replied:
Our land use and our zoning at least need to be compatible. If they approve a land use change that allows something that the zoning doesn’t allow the same uses as the land use, they’re mutually exclusive in some cases. I don’t think they can do that. I think the — our law department would advise the City Com *723 mission not to approve one without the other.
Ms. Slazyk additionally testified that “[w]hen we do an analysis of a land use and zoning classification, we don’t look at it in a vacuum. We study the area.” She explained that their study included a review of how the surrounding properties were zoned and what they were actually being used for.
It is thus clear that: (1) the FLUM Amendment, zoning change, and special use permit all traveled together and were decided together; (2) the City did not make a legislative decision to reformulate its policy regarding the marine industry and land use along the Miami River and in fact, the City decided to leave that decision for another day; (3) the City’s decision to approve the FLUM Amendment was, instead, based on its decision to approve the proposed mixed use project which required a zoning change from SD-4 water dependent/water related Industrial to non-water dependent/water related Restricted Commercial, which in turn necessitated the FLUM Amendment, not the other way around.
Thus, when the dissent argues that: “[bjecause no land development, that is zoning, issues were involved, the ALJ properly refused to consider those parts of this sub-element dealing with zoning ordinances’ ”; “planning is not zoning and changing the Plan does not automatically result in changing the zoning”; “zoning follows planning; planning is not affected by zoning”; “a new use designation does not mean that the rezoning request will or must be granted,” and “the fact that this parcel of property is zoned SD-4.2, is wholly irrelevant as to whether changing the land use designation of this property from Industrial to Restricted Commercial is consistent with the Port of Miami River sub-element,” ignores the record in this case and pretends that Balbino’s land use amendment application was presented and considered in a vacuum'and on its own merits. The record is the record. We cannot ignore it.
Balbino’s FLUM Amendment is clearly inconsistent with the following mandates found in the previously cited objectives and policies listed in the Port of Miami River subelement of the Comprehensive Plan and which the ALJ refused to consider: Objective PA-3.1, which requires the City to “protect the Port of Miami River from encroachment by non water-dependent or water-related land uses”; Policy PA-3.1.1, which requires the City to “encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, ... and to discourage encroachment by incompatible uses”; Policy PA-3.1.2, which requires the City to encourage the development and expansion of the Port of Miami River; Policy 3.1.3, which requires the City to encourage development of compatible land uses in the vicinity of the Port of Miami River; and Policy PA-3.3.1, which requires the City to “support the functions of the Port of Miami River consistent with future goals and objectives of the Comprehensive Plan, particularly with respect to the unique characteristics of the Port of Miami River’s location and its economic position and functioning within the local maritime industry.”[2]
Thus, we conclude that the ALJ erred in refusing to allow the appellants to offer evidence as to Balbino’s FLUM Amendment’s inconsistency with the Port of Mia *724 mi subelement of the Comprehensive Plan and for failing to consider this subelement in determining whether the FLUM Amendment was consistent with the Comprehensive Plan. Based on the record, we also reject the notion that the City’s decision to grant the FLUM Amendment was made after legislatively reformulating its policy regarding the overall vision of the Miami River.
B. Coastal Management
The Comprehensive Plan also contains a section or subelement, titled “Coastal Management,” which addresses the coastal areas located within the City. One of the goals specified in this section is to “[p]rovide an adequate supply of land for water dependent uses.” Goal CM-3. In order to accomplish this goal, Objective CM-3.1 provides: “Allow no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami.” (emphasis added). Moreover, Policy CM-3.1.1 states: “Future land use and development regulations will encourage water dependent uses along the shoreline.”
Despite the stated goals, objectives, and policies regarding the coast of the Miami River, the City approved the Balbino FLUM Amendment to the Comprehensive Plan, changing the land use designation from Industrial to Restricted Commercial and approved a change in the zoning from SD-4.2 Waterfront Industrial to Restricted Commercial. These changes will preclude the very use the Comprehensive Plan specifies should be protected and it is obviously a net loss of acreage devoted to water-dependent use, thereby conflicting with Coastal Management Goal CM-3. Instead of “[p]rovid[ing] an adequate supply of land for water dependent uses[,] ... [a]llow[ing] no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami,” and using its land use regulations to “encourage water dependent uses along the shoreline,” the City approved this land use change to enable it to eliminate the special Waterfront Industrial zoning and avoid the restriction against residential development. The result is an obvious net loss of acreage devoted to water-dependent use and decreases the available supply of land for water-dependent uses without conducting a study and determining whether an adequate supply of land for water-dependent uses still remains.
In addressing Goal CM-3, the ALJ concluded that because the change to a Restricted Commercial land use designation will still permit a commercial marina to operate at that location, the FLUM Amendment will result in no loss of acreage devoted to water-dependent use. This conclusion is unsupported by competent record evidence and ignores the intent of Coastal Management Goal CM-3, the record in this case, and the distinction between acreage “devoted to a water-dependent use” and acreage that “may be used for a marina” but may not be used for any other water-dependent use.
The FLUM Amendment and zoning changes, to Restricted Commercial, with the concurrent approval by the City to allow Balbino to construct over one thousand residential units that are neither water-dependent nor water-related is clearly inconsistent with the goals, objectives, and stated policies of the Coastal Management Section of the Comprehensive Plan. The FLUM Amendment, which allows residential uses and the reclassification of this property from Industrial to Restricted Commercial, has in fact resulted in the elimination of the commercial marina currently operating at that location, as well as twenty-seven of the ninety-three dry boat slips on the Miami River. The Balbino FLUM Amendment to the Com *725 prehensive Plan, changing the land use designation, which is primarily Industrial to Restricted Commercial, and the zoning from SD-4.2 Waterfront Industrial to Restricted Commercial, will result in a net loss of acreage devoted to water-dependent use. The loss of acreage specifically reserved for water-dependent or water-related use conflicts with Coastal Management Goal CM-3. Instead of “[p]rovid[ing] an adequate supply of land for water dependent uses,” ... “[a]llow[ing] no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami,” and using its land use regulations to “encourage water dependent uses along the shoreline,” these changes to this property’s land use [and zoning] will deplete land specifically reserved by the City for Industrial water-dependent uses in its Comprehensive Plan.
The Comprehensive Plan’s goals, objectives, and policy considerations regarding coastal areas, and specifically those coastal areas along the Miami River, are in recognition of how important the shipping industry and other water-dependent uses are to the City’s economy.
In view of the importance to the local economy, the limited available areas suitable for high intensity water dependent uses, and strong population pressures of the 1960’s, the City created in the mid 1960’s a zoning classification entitled Waterfront Industrial. This zoning classification strictly prohibits uses that are not directly related to waterfront activities.
[[Image here]]
Since any new water dependent or related facilities would involve redevelopment of existing waterfront properties, these zoning ordinances are considered sufficient to insure that adequate land area for water-dependent or related uses is protected.
[[Image here]]
Along the Miami River, an economic study in 1986 reported that the firms located in the study area ... have a significant impact on the Miami economy. They employ an estimated 7,000 workers on a full time basis and over 600 part time. Total sales are estimated at $613 million, or about $87,000 for a full time worker. An additional indirect impact of $1.2 billion of business activity in the Miami area is created by firms in the study area. Many of the firms located in the study area are marine related businesses in part composed of water dependent and water related activities.
Miami Comprehensive Neighborhood Plan 1989-2000, Volume II, Data and Analysis, Coastal Management Element (emphasis added).
The ALJ, however, failed to consider the importance of the marine industry to the City’s economy or to appreciate that the Industrial land use designation and Waterfront Industrial SD-4 zoning classification were created to protect those uses and to ensure that there will be adequate land area for water-dependent and water related uses. Because there was no evidence presented, nor was a study performed, to evaluate the sufficiency of the remaining SD^l zoned land along the Miami River, in light of the expected future increases in shipping and other related marine services along the river due to the dredging of the Miami River, the ALJ had insufficient evidence to conclude that the FLUM Amendment would not be inconsistent with the Coastal Management section of the Comprehensive Plan.
C. Future Land Use
As with the two preceding sections or subelements of the Comprehensive Plan, the ALJ made findings that were unsupported by competent evidence and he *726 failed to consider important relevant goals contained in the Future Land Use section of the Comprehensive Plan.
The Future Land Use section of the Comprehensive Plan provides that one of its future land use goals is to “[mjaintain a land use pattern that (1) protects and enhances the quality of life in the city’s residential neighborhoods; (2) fosters redevelopment and revitalization of blighted or declining areas; (3) promotes and facilitates economic development and the growth of job opportunities in the city ... and (6) protects and conserves the city’s significant natural and coastal resources.” Goal LU-1.
The ALJ found that the FLUM Amendment is consistent with Goal LU-1. He concluded that because the “FLUM Amendment will eliminate the potential for development of industrial uses that may generate excessive amounts of noise, smoke, fumes, illumination, traffic, hazardous wastes, or negative visual impact[,]” it will improve the quality of life of the surrounding neighborhoods, and it is, therefore, consistent with LU-l(l). He additionally found that because the Balbino property is located in Allapattah, a declining area, the FLUM Amendment will provide redevelopment and revitalization of the area, and is, therefore, consistent with subpart LU-1(2). There was, however, no actual evidence presented to support these conclusions, and the evidence that was presented, is contrary.
The Future Land Use section of the Comprehensive Plan, Goal LU-l(l) requires the City to “[m]aintain a land use pattern that protects and enhances the quality of life in the city’s residential neighborhoods.” Ms. Stetser, a resident who lives in Allapattah near the Balbino property, testified that rather than “enhancing the quality of life” in the neighborhood, the addition of over two thousand additional cars to the already congested two-lane North River Drive and to the 17th Avenue bridge, which already backs up, will cause further delays and frustration to the neighborhood’s drivers. This evidence was unrefuted. In fact, as will be discussed later, no transportation studies were conducted.
Additionally, the following evidence, which the ALJ failed to consider, was presented. In 1997, the Florida Legislature created the Miami River Study Commission to assess the various issues along the Miami River and to make recommendations for improving its management; in 1998, the Legislature established the Miami River Commission to coordinate state, regional, and local activities impacting the Miami River; and in 1999, the Legislature adopted the Urban Infill and Redevelopment Act to assist local governments in implementing their local comprehensive plans. In 2000, in recognition of the importance of the Miami River and the need for a single, multi-jurisdictional plan for the entire Miami River Corridor, the City, Miami-Dade County, and the Miami River Commission executed a joint planning agreement to create an urban infill plan for the Miami River Corridor. After two years of collaborative effort, the Infill Plan was adopted by the Miami River Commission and Miami-Dade County as their Strategic Plan. While the City has not yet adopted the Infill Plan it helped create, it does periodically refer to data contained in the Infill Plan, and it was relied upon, in part, by the City, the ALJ, and Balbino during the proceedings.
The Infill Plan identifies the Allapattah area as a neighborhood stretching from N.W. 17th Avenue to N.W. 27th Avenue on the north bank of the Miami River. The Balbino property is located at approximately N.W. 18th Avenue directly on the north side of the Miami River. The Infill *727 Plan notes that Allapattah is the home to thriving marinas, two of the largest yacht basins on the Miami River, numerous produce and flower markets, and a thriving wholesale and retail clothing district on N.W. 20th Street. In addressing the waterfront properties along the Miami River, the Infill Plan specifically states that both high density and lower density residential development may not be the most appropriate use of the neighborhood’s river frontage and that “Allapattah’s waterfront industrial zoning should be maintained.”
LU-1(2) of the Future Land Use section of the Comprehensive Plan requires the City to “[mjaintain a land use pattern that fosters redevelopment and revitalization of blighted areas.” The ALJ found the FLUM Amendment was consistent with LU-1(2). This finding, however, is unsupported by the evidence. While some of the neighborhoods in Allapattah may be “declining,” recent studies show that others, including some Industrial waterfront properties, are “thriving.” Additionally, while it may be beneficial to encourage development in the Allapattah area as a whole, residential development along the waterfront in areas designated as Industrial on the land use map and zoned Waterfront Industrial is inconsistent with various other provisions within the Comprehensive Plan. For example: LU-1(6) of the Future Land Use section of the Comprehensive Plan requires the City to “[mjaintain a land use pattern that protects and conserves the city’s significant natural and coastal resources.” Thus, when encouraging development in the City and the Alla-pattah area, the City must do so in a way that also protects and conserves the City’s coastal resources, and does not violate any of the provisions of the River Plan or other elements of the Comprehensive Plan.
LU-1(3) of the Future Land Use section of the Comprehensive Plan requires the City to “[mjaintain a land use pattern that promotes and facilitates economic development and the growth of job opportunities in the city.” Rather than promoting economic development and the growth of job opportunities as required in LU-1(3), the evidence establishes that the FLUM Amendment will do just the opposite. Jack Luft testified that the Miami River Master Plan; the Urban Infill Plan; the City of Miami, Miami River Market Analysis; and the 2004 Economic Impact Analysis all reflect that the Miami River and its marine industrial base are a significant source of jobs and economic enhancement to the City. This includes not only the shipping industry, but also a variety of marine industrial support services that reinforce and directly serve the industry. He noted that from 1991 to 2001, the marine industries on the river doubled in ports serving the Caribbean and in the cargo handled along the river. Jobs have tripled. The Miami River marine industry is an important economic asset to the City which provided over $4 billion in trade during the ten-year period from 1991 to 2001. Mr. Luft testified that “this amendment eliminates irreplaceable marine industrial land from the river. There is not another place to recapture it, and it completely violates the promotion and facilitation of economic development of one of the most important industries in the city. It’s clear.” Mr. Luft additionally stated that the FLUM Amendment not only eliminates this particular marine use on the Miami River, it threatens the viability and the very existence of the surrounding marine industrial uses and it is the Miami River maritime industry itself that provides jobs in the region. Again, this evidence was unrefuted. The only evidence Balbino offered was that his high density residential high-rise complex would be lo *728 cated in close proximity to the Civic Center, and could provide housing to those working within the area of the Civic Center. While it is true that there is a large number of people employed within the Civic Center area, there was no evidence presented that additional housing was needed to support the Civic Center workforce. But more importantly, the ALJ failed to recognize that even if the development of residential units in Allapattah could benefit people working in the area of the Civic Center, those units could be constructed on a number of other sites within Allapat-tah, and even along the banks of the Miami River, without converting one of the few remaining Industrial water-related/water-dependent parcels of land reserved for and to support the maintenance of the marine industry.
The ALJ also failed to address LU-1(6), which requires the City to “[mjaintain a land use pattern that protects and conserves the city’s significant natural and coastal resources.” Since 2000, fifty percent of the properties designated for marine industrial water-related and water-dependent uses along the banks of the Miami River have been lost due to the multiple small scale land use amendments passed to make way for residential high-rises. These small scale amendments do not require the scrutiny that is normally required to amend the Comprehensive Plan. Therefore, developers, with City approval, have been compromising the marine industry and, in effect, changing the Comprehensive Plan piecemeal, rather than performing a comprehensive review with appropriate public and governmental input and oversight. The Balbino FLUM Amendment is an example of this piecemeal alteration of the City’s coastal resources, and when viewed in conjunction with the other small scale amendments, dramatically affects the stated goals and objectives to preserve the Miami River as a working river, which are to protect the marine industries along the river and to reserve a sufficient amount of waterfront industrial land for expansion of water-dependent and water-related uses.
Despite the FLUM Amendment’s conflict with the overall goals, objectives, and policies specified in Goal LU-1 of the Future Land Use section of the Comprehensive Plan, the ALJ upheld Balbino’s FLUM Amendment because he found that it was consistent with Policy LU-1.3.6, which encourages “diversification in the mix of industrial and commercial activities and tenants” in certain areas of the City, including the “River Corridor.” The ALJ, however, failed to consider that while diversification and mixed-use classifications may be desirable in certain locations along the River Corridor, the Comprehensive Plan and the River Master Plan make it clear that these goals only apply to appropriately zoned areas, not to land reserved for waterfront industrial purposes:
Goal CM-S: Provide an adequate supply of land for water dependent uses.
Objective CM-3.1: Allow no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami.
Miami Comprehensive Neighborhood Plan 1989-2000, Volume II, Data and Analysis, Coastal Management Element: In view of the importance to the local economy, the limited available areas suitable for high intensity water dependent uses, and strong population pressures of the 1960’s, the City created in the mid 1960’s a zoning classification entitled Waterfront Industrial. This zoning classification strictly prohibits uses that are not directly related to waterfront activities.
*729 River Master Plan, 0.2: The function of the Miami River as a “working waterfront” should be preserved. Scarce waterfront land should be reserved, wherever possible, for use by businesses that are dependent on a waterfront location or are essentially related to the maritime economy of the area.
River Master Plan, Urban Design 4.20: New housing construction should be encouraged, except on lands reserved for water-dependent uses.
River Master Plan, Urban Design 4.20, Objective 4.8: Encourage residential development on appropriately zoned lands in the Mid-River area.
(Emphasis added).
While residential development may be desirable in certain areas along the Miami River, the Comprehensive Plan and the Miami River Master Plan make it clear that the very limited specially protected Industrial parcels of land on the Miami River, which have been reserved through a very lengthy comprehensive process of land use planning, must be preserved. In addition to this long-range planning strategy for the Miami River are the measures taken in support of the City’s long-range plan.
Jack Luft testified that Miami and Florida have initiated an aggressive marketing campaign to strengthen its ports. The Caribbean Basin Initiative and the recent Central American Free Trade Agreement (CAFTA) are two of those initiatives. He additionally noted that Rule 9J-5 of the State Administrative Code requires the City to do an assessment of need. In compliance with Rule 9J-5, the studies performed demonstrate an enormous need to preserve waterfront industrial sites along the Miami River. The Port of Miami River handles one-third of the tonnage that serves the Caribbean basin and is one of the major ports serving the shallow draft ports of the Caribbean. Mr. Luft testified that the existing need, while great, is continuing to grow with no other location to fulfill the need. He astutely pointed out that while there are many suitable upland locations for the residential buildings planned by this developer, the marine industry has no such latitude.
We therefore find that the ALJ’s finding that Balbino’s FLUM Amendment is consistent with the Future Land Use section of the Comprehensive Plan is unsupported by the evidence presented. We conclude, that based on the evidence presented, it is clearly inconsistent.
MIAMI RIVER MASTER PLAN
(“River Master Plan”)
The River Master Plan is the result of a planning study undertaken by the City of Miami Department of Planning, Building and Zoning, to provide a long-range and a short-range vision of the Miami River as a “working waterfront.” The River Master Plan provides a pattern of land use that encompasses this “vision” and was intended to offer certainty in the marine industry for potential expansion and investment. To accomplish these goals, the River Master Plan specifically provides that:
The function of the Miami River as a “working waterfront” should be preserved. Scarce waterfront land should be reserved, wherever possible, for use by businesses that are dependent on a waterfront location or are essentially related to the maritime economy of the area.
The river should grow as a shallow draft seaport — a lifeline to the Caribbean Basin — providing good-paying jobs for city residents. New shipping *730 terminals should be located where they will not be detrimental to residential neighborhoods.
The river’s role in the regional market for repair, sales and service of boats and marine equipment should be maintained and strengthened.
The marine character embodied by the fishing industry on the river should be preserved.
River Master Plan, Executive summary, at 0.2 (emphasis added).
The River Master Plan addresses the limited availability of land suitable to development and expansion of water-dependent marine businesses, stating in pertinent part:
Within Dade County, there is estimated to be only 13.7 acres of undeveloped land[3] with suitable water access and zoning to permit expansion of water-dependent marine businesses. Of that total, 8 acres are located on the Miami River. Given the economic significance of the marine industry, particularly in terms of the type and number of jobs created, it is important to prevent encroachment upon the limited amount of land available for growth of marine activities in the Miami River area.
[[Image here]]
RECOMMENDATIONS
Objective:
1.1 Reserve the limited amount of waterfront land available for expansion of marine industries.
Policies:
1.1.1 Retain and enforce the requirement for water-dependent and water-related uses within areas currently designated SD-4 in the City of Miami.
River Master Plan, The Working Waterfront at 1.4 — 1.5 (emphasis added).
The River Master Plan also specifically addresses the SD-4 zoning designation for coastal areas along the Miami River to provide protection from intrusion by non-water-dependent or related uses.
In the City of Miami, marine industries along the Miami River and its tributaries are protected by a special zoning designation from intrusion by other uses that are not dependent on a waterfront location. This special zoning is called “SD-4, Waterfront Industrial Special District.” It is intended for application in areas appropriately located for marine activities, to limit principal and accessory uses to those reasonably requiring waterfront locations, and to exclude residential, general commercial, service, office or manufacturing uses not primarily related to waterfront activities.
River Master Plan, The Working Waterfront, at 1.12 (emphasis added). The River Master Plan divides the SD^4 zoning classification into two categories: SD-4.1, Waterfront Commercial and SD-4.2, Waterfront Industrial. Waterfront Commercial, SD-4.1 includes mai'inas, boatyards, fisheries, boat sales and service, mixed use, and limited restaurant or residential with water dependent use. Waterfront Industrial, SD-4.2 includes shipping terminals, marine contractors, commercial shipyards, towing, and salvage, and all SD-4.1 uses, except residential.
This waterfront zoning classification was recommended by City planners in 1956, was adopted by the City in 1961, and generally remained intact until recent years when the City began approving *731 small scale amendments to the Comprehensive Plan and the concurrent zoning changes. Most of Balbino’s property is zoned SD-4.2, Waterfront Industrial property, and therefore, is reserved for waterfront industrial purposes and specifically excludes any residential uses.
The City, Balbino, the ALJ, and the dissent all contend that, because the subject property is located in the “Mid-River” section where most of the existing housing is located along the Miami River, a change from an Industrial land use, zoned SD-4.2, Waterfront Industrial, to a mixed-use residential Restricted Commercial designation is consistent with the area’s land use. We disagree, as the River Master Plan, which recognizes the importance of housing opportunities in the Mid-River area, specifically limits housing to land not reserved for water-dependent uses.
Residential Development
[[Image here]]
A number of opportunities remain for development of new housing by building on vacant lots or by increasing the density of existing developed lots. New housing construction should be encouraged, except on lands reserved for water-dependent uses. In the proposed SD-4.1 Waterfront Commercial zoning district (see page 1.14) residential development could be permitted as an accessory use to a marina.
[[Image here]]
Objective:
4.8 Encourage residential development on appropriately zoned lands in the Mid-River area.
River Master Plan, Mid-River, at 4.20 (emphasis added). Balbino’s property, which is zoned SD-4.2, Waterfront Industrial, therefore, is specifically excluded from the City’s stated residential development goals along the Mid-River. Even SD-4.1, Waterfront Commercial zoned land may only include residential development as an accessory use to a marina.
Lastly, the River Master Plan recognizes that higher land values and the concomitant increase in property taxes would result in the displacement of marine businesses and that the SD^4, Waterfront Industrial zoning was created, in part, to protect the maritime industry along the Miami River from being priced out of the location. It, therefore, provides for specific objectives and policies to protect these marine businesses from displacement by higher land values.
Land Values
One issue which directly affects the continued viability of marinas and small boatyards, as well as other businesses along the Miami River, is that of increasing land values and the concomitant increase in property taxes. Clearly this has been the case in the Downtown portion of the river and has resulted in the displacement of marine businesses with office buildings....
RECOMMENDATIONS
Objective:
1.3 Preserve the marine repair, service, equipment and related industries along the Miami River that are vital to the shipping industry or the recreational boating industry.
Policies:
1.3.1 Protect boatyards and related marine businesses from displacement by higher land value uses by adopting separate “marine industrial” and “marine commercial” zoning district classifications.
River Master Plan, Marinas and Boatyards, at 1.9. Balbino’s FLUM Amendment, changing the land use designation from Industrial to Restricted Commercial, is clearly inconsistent with the objectives *732 and policy considerations relating to property values. Balbino’s 1,073-unit residential towers would most likely raise nearby property values and taxes, not protect them, thereby creating a financial strain on smaller marine businesses critical to the working waterfront. The ALJ erred in failing to consider this issue in finding that the FLUM Amendment was consistent with the River Master Plan.
Inexplicably, the dissent and the ALJ completely ignore the River Master Plan despite its adoption by the City in 1992 and the fact that the ALJ and the parties referenced its provisions throughout the proceedings. Perhaps this oversight is due to the clear language contained in the River Master Plan which requires the City to protect the “working waterfront,” preserve the waterfront locations reserved for the maritime industry, and to prevent encroachment upon the limited amount of land available along the Miami River for growth of maritime activities on and along the River.
MISCELLANEOUS
(1) Concurrency:
Section 163.3180(l)(a) provides that concurrency requirements regarding sanitary sewer, solid waste, drainage, potable water, and transportation facilities be met. Additionally, Florida Administrative Code Rule 9J-5.005(2)(a) provides that “[a]ll goals, objectives, policies, standards, findings and conclusions ... within plan amendments and their support documents, shall be based upon relevant and appropriate data and the analyses applicable to each element.” While Rule 9J-5.005 does not require the City or Planning Department to personally compile the original data and perform its own original analysis, it does require review of the applicable data and that it be provided by acceptable existing sources. Rule 9J-5(2)(a) further specifies that “[a]ll tables, charts, graphs, maps, figures and data sources, and their limitations, shall be clearly described where such data occur in the above documents,” and that the Department must determine whether the data was “collected and applied in a professionally acceptable manner.”
Although Ms. Slazyk testified that Balbi-no’s FLUM Amendment met the concurrency requirements of section 163.3180(l)(a), there is no competent evidence in this record to support her conclu-sory statement. In fact, the only record evidence relating to concurrency is a one-page “analysis” submitted by the Department addressing the impact of the Balbino FLUM Amendment on recreation and open space, potable water, sanitary sewer transmission, storm sewer capacity, solid waste collection, and traffic. This one-page document, however, performs no analysis and reflects that the conclusions reached were, instead, based on “assumptions.” The recreation/open space concurrency, by the Department’s own admission, was assumed. Sanitary sewer transmission, by the Department’s own admission, was assumed, and the Department admits that the capacity to service 2,877 new residents is “currently not known.” As to the collection of solid waste, the “analysis” shows that the excess capacity prior to the proposed Amendment was eight hundred and with the addition of 2,877 residents, a deficit would exist. The availability of potable water was not even analyzed. The conclusions reached regarding these elements are not supported by any data, and the Department lists no sources for the data it allegedly relied on.
Jack Luft specifically addressed the Department’s failure to comply with Rule 9J-5. As to the Department’s assumptions regarding the City’s ability to meet trans *733 portation requirements, he stated the following:
This site is particularly problematic.... I am — I’m supportive of high density, but the Master Plan specifically says that high densities shall be located in proximity to, convenient to, accessible to, concentrations of employment, mass transit facilities, and services. And, indeed, the river plan speaks specifically to the question of the lack of services. We’re talking about basic services along the river. At his location, we have marine industrial to the west. We have an already built multi-family structure to the east, and we have no immediate services at this location. None.
Mr. Luft additionally demonstrated the need for concrete data, as opposed to mere assumptions. For example, the City made an assumption that twenty percent of the trips in and out of this site would be by something other than an automobile (bike, walking, bus). However, Mr. Luft noted that bus service is several blocks away; there is no direct bus service to the Civic Center, which Balbino claims will benefit from the “affordable” housing he intends to provide; and the Metrorail, which is a mile away and is located within the Civic Center, will not provide transportation from Allapattah to the Civic Center or visa-versa. Mr. Luft, drawing on his experience as a mixed use and transit land planner, explained that the best mixed-use environments such as Brickell Avenue may support a fifteen percent ratio, which he explained is a very high split, but such an assumption for the Allapattah area is totally unrealistic.
[T]his project has one glaring problem, ... if you read the MUSP very carefully, and that is the impacts of traffic on critical north/south arterial intersections, and the project has just managed to bring those impacts into the level of Service “E” category to avoid collapsing the intersection, and do you know how they manage to do that by the numbers? They said, this location is essentially the same as the Omni and Brickell, in terms of mass transit access, in terms of pedestrian movements, and in terms of bicycles, and by saying that, they can magically transform 17 percent of the trips from automobiles to bicycles and pedestrians, and busses, but you’d have to buy into the argument that this location at 19th Avenue and the river, with no direct bus access from there to the Civic Center, is going to engender the same kind of pedestrian traffic as the People Mover system and the transit system in downtown and the Omni. As a planner for your transit system and your station area plan for 10 years in the City, I will tell you, it will not, and as a member of the Governor’s Planning Council for six years on bicycle planning in the State of Florida, I will tell you, you will not get more than one percent, and that’s my expert opinion. In other words, those assumptions are incorrect and if you use the proper numbers, those intersections fail, and when they fail, you have an adverse impact that Section 1308 says you must mitigate, and there is no way to do it with this number of units. It fails to meet the standards of protecting adverse impacts against neighborhoods.
Mr. Luft opined that the reason the City assumed a twenty percent ratio was because the traffic consultants for this project noted that the level of service for 17th Avenue was right at the margin of Service E, which is as low as the City is permitted to go, and that any additional traffic beyond the City’s “assumptions,” even a small increase, would put the level of service at Service D, which according to the Comprehensive Plan, is not acceptable.
*734 Lastly, Mr. Luft testified that the purpose of the Future Land Use Map in the Comprehensive Plan is to direct the market to areas where infrastructure is already in place, that a guiding principle of Florida’s Growth Management is to allow market demand to drive the planning process, and this project violates these principles.
(2) Support for the project:
The dissent documents individual support for the project. There was not, however, overwhelming support for the project. Tucker Gibbs, representing the Durham Park Neighborhood Association (a plaintiff in this litigation), which is located directly across the Miami River from the proposed project and is composed of approximately ninety affected homeowners, testified that his clients objected to the proposed land use and zoning amendments and the Special Use permit granted by the City to Balbino. He expressed his concern on behalf of his clients that in the preceding three-and-a-half years, the City approved Comprehensive Plan amendments to 27.4 acres of the remaining 79.8 acres of the designated Marine Industrial sites along the Miami River — almost one-third of the Industrial property on the Miami River. He noted that the City wanted a mega yacht marina but that it was reducing the available sites to service these yachts and it was destroying the marine industry on the River. He noted that these three residential buildings — in excess of twenty stories each— were incompatible with the industry along the Miami River and single family and low density condominium residential units in the area. He concluded by reminding the City that its Comprehensive Plan is its constitution regarding land use and by systematically turning its back on its constitution, the City was turning its back on a very valuable resource that once destroyed cannot be recaptured.
Horacio Aguirre, who lives across the Miami River from the Balbino property, testified that the Miami River is not the property of the Allapattah neighborhood and that it is a valuable resource to the City of Miami and Miami-Dade County. Mr. Aguirre testified that the City advertises itself as a boating capital and eliminating the property currently being used as a recreational marine boatyard will strike a serious blow to the boating community. He also testified that the recreational marine industry in Greater Miami is at a peril to the condominium developers.
Dr. Francis Bohnsack, the Executive Director of the Miami River Marine Group and the Port Director of the Port of Miami River, testified on behalf of the Miami River Marine Group, a trade association consisting of approximately sixty members who own businesses on the Miami River and who object to the FLUM Amendment. Although the ALJ did not permit Dr. Bohnsack to render any opinions regarding the impact the Balbino FLUM Amendment would have on the marine industry, she did testify that the marine industry on the Miami River is a growing industry which will grow further after the dredging is completed. She testified that the loss of marine industrial land on the Miami River jeopardizes business on the Miami River.
Ann Freemont, a resident across the Miami River in Durham Park only five hundred feet from the project, also testified regarding her objections to the Balbi-no FLUM Amendment. She stated that: she is a “pleasure boater,” she depends on the boatyard at that location, the City has seven hundred boaters in marinas that need to be serviced, and there are over four thousand vessels in the water in her area which need to be serviced and depend *735 on the marine industry on the Miami River. Ms. Freemont strongly objected.
Ann Stetser who lives in Allapattah testified that she and her husband are “very opposed” to the project, as did Deborah Trujillo-Carpenter, who also lives in Alla-pattah. Ms. Trujillo-Carpenter testified that these 28-story buildings would dwarf everything in the neighborhood, block the sun, block the wind, block their views, and if the City eliminates self-help boatyards like this one, people will resort to fixing them boats in their yards. She additionally noted that mega yachts go past her home all day and they need some place to “be fixed as well.”
Mr. Payne, who owns a towing and transportation tug company and two properties on the Miami River, also objected to the Balbino FLUM Amendment, noting that the jobs produced by the marine industry on the River are important to the people of Allapattah. He testified: “I think that instead of building on the river and killing this resource we have, I think we need to embrace this resource,” and he noted that the City was running out of property along the Miami River to do that.
Brett Bibeaux, the Managing Direct of the Miami River Commission, who appeared at the request of the City Commission to provide an advisory recommendation on behalf of the Miami River Commission, informed the City that the Miami River Commission found the Bal-bino proposal to be inconsistent with the Miami River Corridor Urban Infill Plan, “our adopted plan of Miami River Corridor improvement initiatives.”
And lastly, the record reflects that the City’s Planning Advisory Board also did not approve the proposed FLUM Amendment.
CONCLUSION
While we recognize that agency action enjoys great deference, findings of fact must be supported by competent, substantial evidence. Furthermore, when the agency incorrectly interprets the law or fails to apply the law, the decision rendered is subject to reversal. We conclude that the ALJ erred in: precluding the appellants from introducing evidence and in making argument regarding the FLUM Amendment’s inconsistency with the Port of Miami River subelement of the Comprehensive Plan; failing to consider the Port of Miami River subelement of the Comprehensive Plan and critical areas of the Coastal Management and Future Land Use sections of the Comprehensive Plan; failing to consider critical sections of the River Master Plan; and making findings that were unsupported by the evidence. We find that had the ALJ considered these areas of the Comprehensive Plan and the River Master Plan, he could not have concluded that Balbino’s FLUM Amendment was consistent with either. We therefore reverse.
We further note that these “small scale” amendments, when viewed together as a whole, are changing the character of the Miami River waterfront without proper long range planning or input from appropriate agencies, departments, and citizen groups. Because the Miami River is such an important asset to the City, County, and State, such piecemeal, haphazard changes are not only ill-advised, they are contrary to the goals and objectives of those who worked together, debated, and determined how the Miami River waterfront should be developed. If the City’s vision for the Miami River has changed, then that change should be clearly reflected in its Comprehensive Plan to pro *736 vide industries and land owners along the Miami River with fair notice.
Reversed.
CORTIÑAS, J., concurs.
GERSTEN, J., dissents and concurs with Judge Wells’ dissent on rehearing en banc. See Payne v. City of Miami, 3D06-1799 (2010)(GERSTEN, J., concurring dissent).
Before RAMIREZ, C.J., and GERSTEN, WELLS, SHEPHERD, SUAREZ, CORTINAS, ROTHENBERG, LAGOA and SALTER, JJ.

. The 2005 version of this statute provides a further exception where the future land use category allows a maximum residential density allowable under the existing land use category, an exception which does not pertain to the Balbino FLUM Amendment.

. Policy PA-3.3.1 does not involve land development. Its relevance is therefore not in dispute.

. The River Master Plan was adopted in 1992. Thus, the data is reflective of available water-dependent land at that time.