WELLS, Judge,
dissenting from denial of Rehearing and Rehearing En Banc.
This appeal, like that in Payne v. City of Miami, 32 Fla. L. Weekly D1885 (Fla. 3d DCA Aug. 8, 2007), substituted opinion issued December 8, 2010, 52 So.3d 707 (Wells, J., dissenting from denial of rehearing en banc) (“Balbino ”), and Payne v. City of Miami, 32 Fla. L. Weekly D2055 (Fla. 3d DCA Aug. 29, 2007), substituted opinion issued December 8, 2010, 53 So.3d 258 (Wells, J., dissenting from denial of rehearing en banc) (“Riverside ”), involves a small scale amendment to the future land use map (FLUM) component of the City of Miami’s Comprehensive Plan (Plan) and is governed by section 163.3187(l)(c) of the Florida Statutes. In accordance with my dissenting opinions to the denials of rehearing en banc in Balbino and Riverside, I dissent from the denial of rehearing and rehearing en banc herein.[1] As I concluded in those cases, I believe the final order of the Florida Department of Community Affairs finding the amendment “in compliance” was fully supported by both competent, substantial evidence and the law, and should be affirmed.
FACTS
Brisas del Rio (“Brisas”) is the owner of two parcels of property located on the southern side of the Miami River at 15th Street and Northwest 14th Avenue. This property is located in the City of Miami and is bounded on the north by the Miami River, on the south by a low density residential neighborhood, on the west by a *246 condominium development, and on the east by Florida Detroit Diesel-Allison, an engine repair facility that services both boats and buses. A large park, Curtis Park, is across the river from this property.
Of the two parcels, Parcel One remains designated “Medium Density Multifamily Residential” on the City’s FLUM. Parcel Two carried two land use designations, “Industrial” and “Medium Density Multifamily Residential,” which Brisas sought to change to “Restricted Commercial.”
UNDERLYING PROCEEDINGS
Proceedings Before the City Commission
On February 23, 2006, the City Commission considered Brisas’ application for a small scale amendment to the FLUM for a project consisting of a condominium, townhouses, retail space, marina, marine taxi station, one-half acre of open green space, and a riverwalk. Prior to Brisas’ purchase, this property had not been used for approximately six years.
Lourdes Slazyk, the assistant director of Planning and Zoning, appeared and filed a report prepared by the Planning Department, recommending that this application, along with Brisas’ request for rezoning, be granted. According to the Planning Department, all concurrency requirements, save that relating to sanitary sewers which required County water and sewer department approval, had been met.
Brisas presented additional testimony demonstrating that surface access to this property was entirely on roadways through residential neighborhoods, making the property’s existing designations incompatible with surrounding properties, and that the proposed change would increase public access to the river and bring people back to the river as contemplated in the Plan.
The project was opposed, as were the Balbino and Riverside projects, by the Miami River Marine Group, an entity representing marine and industrial business owners along the Miami River, by the Durham Park Neighborhood Association (“Durham Park”), an association of nearby single-family residences, and by Herbert Payne, the owner of a tugboat towing company operating on the river. The Miami River Marine Group opposed the project on the grounds that the project would further deplete property available for the working waterfront. Durham Park opposed the project on the same grounds as did the Miami River Marine Group and additionally on the ground that the project would deplete infrastructure levels of service. Captain Payne, who employed twenty nine people, claimed that this and other projects would overburden the City’s roadways, increase property taxes, and hinder and destroy an industry employing over 8000 people. Additional opposition came from the Miami River Commission, the clearinghouse for all interests on the Miami River, which claimed that the zoning change requested would be inconsistent with the Miami River Corridor Urban Infill Plan, a plan not adopted by the City.
Following discussion on (1) the condition of the site (including one of the Commissioner’s observations regarding “a whole bunch of abandoned containers where there are homeless living ... abandoned buses, inoperable buses, inoperable trucks, piles of tires[, and an occasion where there was] ... a lady screaming out in the middle of the street because there were two guys inside the property and one of the guys was naked, on drugs”), and (2) whether projects such as this were displacing any businesses or were only redeveloping abandoned sites, the City Commission voted unanimously to approve the requested Plan amendment.
*247 On April 3, 2006, Durham Park, the Miami River Marine Group, and Captain Payne petitioned the Division of Administrative Hearings for review, claiming as they had with the Balbino property, that the property was larger than the ten acre limit for small scale amendments. They also claimed, as they had with both the Balbino and Riverside properties, that the amendment was internally inconsistent with other provisions of the City’s Plan; that the amendment was not supported by adequate data and analysis; and that the FLUM amendment was not “in compliance.” [2]
Proceedings Before the Administrative Law Judge
Prior to hearing, the administrative law judge (ALJ) struck all reference to Chapter 9J-11 of the Florida Administrative Code as well as all claims relating to a number of portions of the FLUM * because they had “no conceivable bearing on the FLUM amendment at issue.” The ALJ expressly refused to strike allegations regarding either lot size, plan provisions relating to land use development orders (zoning regulations), and the Port of Miami River which might “be relevant to background and data and analysis.” This left Petitioners’ claims regarding the following goals, objectives and polices: Goal LU-1, Policy LU-1.1.1, Policy LU-1.1.1, Policy LU-1.1.2, Policy LU-1.1.10, Policy LU-1.1.11, Objective LU-1.2, Objective LU-1.3, Policy LU-1.3.6, Objective LU-1.5, Objective LU-1.6, Policy LU-1.6.1, Policy LU-1.6.4, Goal PA-3, Objective PA-3.1, Policy PA-3.1.1, Policy PA-3.1.2, Policy PA-3.1.3, Objective PA-3.2, Policy PA-3.2.1, Objective PA-3.3, Policy HO-1.1.9, Policy HO-2.1.4, Goal TR-1, Policy TR-1.1.1, Policy TR-1.5.10, Objective NR-1.3, Objective NR-3.2, Policy NR-3.2.1, Policy NR-3.2.2, Policy NR-3.2.3, Goal CM-4, Objective CM-4.1, Policy CM-4.1.5, Objective PW-1.2, Policy PW-1.2.1, Policy CI-1.2.3"
The testimony regarding Petitioners’ claims relating to these goals, policies, and objectives came from five witnesses called by the Petitioners. Lourdes Slazyk, the assistant director of the City’s Planning Department, testified, without contradiction, that the City used net lot area when determining acreage for planning purposes and that this property did not exceed the 10 acre limit imposed by section 163.3187 of the Florida Statutes.[3] She *248 also testified that the amendment sought by Brisas met all concurrency requirements (save that relating to potable water which is the province of Miami-Dade County) and was consistent with the City’s Plan. According to Ms. Slazyk, staff members of the City’s various departments analyzed the instant application using the information contained (1) in volume II of the Plan; (2) in the Miami River Master Plan; and (3) in the documents submitted by Brisas in support of its application. Because the Miami River Corridor Urban Infill Plan had never been adopted by the City, the Planning Department did not consider it when analyzing this application. According to Ms. Slazyk, the amendment met all traffic and other concurrency requirements and was wholly consistent with the surrounding properties which were part industrial and part mixed-use medium density, multi-family residential.
This expert testimony was not rebutted by any of the four other witnesses who testified. Stuart Aguirre, a resident of nearby Durham Pai'k, the single family residential neighborhood, testified only that traffic has increased on nearby roadways since he purchased his Durham Park home in 2002. Herbert Payne, the owner of P & L Towing and Transport testified that condominiums are incompatible with a working river because of the noise involved in river work. He did, however, candidly admit that the river was not just a working river but also was, and had for decades been, a river of residences. Interestingly, Captain Payne confirmed that business on the river was in an economic downturn. Specifically, he testified that his business had gone downhill after September 11, 2001 and had rebounded only after he took two of his tug boats to work in the Gulf of Mexico. This testimony appears to be mirrored by an economic impact study prepared by the Marine Industries Association of South Florida in January 2006, which showed that from 1993 to 2005, of the top ten marine industry counties, Miami-Dade County was third to last, ahead of only Duval and Broward Counties in the number of watercraft registered. This same study put Miami-Dade County dead last by a sizable margin (80% for Miami-Dade compared to 153% for the nearest county) in marine gross sales.
Brett Bebeau, a Miami River Commission employee, testified that the Miami River Commission had considered Brisas’ application and in a seven to six vote — that is, seven members finding it incompatible, while six found it to be compatible — concluded that it was inconsistent, not with the Comprehensive Plan, but with the unadopted Miami River Corridor Urban Infill Plan.
Fran Bohnsack, an employee of the Miami River Marine Group, Inc., a trade association representing businesses on the Miami River, testified that the Miami River was a working river with residences on it, especially in the middle river, where this property is located. According to Ms. *249 Bohnsack, this amendment is inconsistent with the Plan because the Port of Miami River is a unique shallow draft port responsible for $4 billion in trade a year, which since 2000 has been threatened by loss of over one half of the acreage available to it. Ms. Bohnsack failed, however, to state that the Miami River Commission, of which her group is a member and ardent supporter, recommended approval of eight of fourteen changes which resulted in this purported “loss.” In fact, the Miami River Commission either agreed or did not object to changing almost one half of the acres purportedly lost:
In 2000 there were 78 acres of marine industrial (SD-4) zoned properties in the City of Miami on the Miami River. Since then, 14 individual small scale land use and zoning amendment applications were approved, removing 43 acres of marine industrial (SD-4) zoned properties for residential developments, leaving 35.7 acres of marine industrial (SD-4) properties within the City of Miami on the Miami River. The following is a list of the 14 approved applications for small scale land use and zoning amendment applications ... for residential developments ... from 2000 — February 2006:

Approved Small Scale Zoning and Land Use Amendments

1. 1951 NW South River Drive ... 92,-783 square feet ... (MRC recommended denial)
2. 2415 NW 16 ST RD, “River Run South” ... 116,836 square feet ... (MRC recommended denial)
3. 615 SW2 Ave, ... 95,505 square feet ... (MRC recommended approval)
4. 610 SW 1 Ave ... 57,500 square feet (MRC recommended approval)
5. 610 SW 1 Ave ... 37,500 square feet (MRC recommended approval)
6. 619 SW 1 Ave ... 4,450 square feet ... (MRC recommended approval)
7. 1960 NW 27 Ave ... 77,524 square feet ... (MRC recommended denial)
8. 1001 NW 7 ST ... 274,864 square feet ... (MRC recommended approval)
9. 1884 NW N River Drive ... 379,230 square feet ... (MRC recommended denial)
10. 201 SW 6 ST ... 22,043 square feet ... (MRC recommended approval)
11. 517 NW South River Drive ... 28,-617 square feet ... (MRC recommended approval)
12. 555-663 NW South River Drive ... 84,998 square feet (MRC recommended approval)
13. 1583 NW 24 Ave ... 409,764 square feet ... (MRC recommended denial)
14. 2215 NW 14 ST ... 191,985 square feet ... (MRC tied)
Grand total approved small scale land use and zoning amendments in the City of Miami along the Miami River, from Marine Industrial for residential developments, is 1,873,599 total square feet or 43 acres.
“Comparison of Marine Industrial Zoning (SD-4) in the City of Miami 2000 — February, 27[sic] 2006” (some emphasis added).
Based on this testimony, the ALJ concluded that: although the use immediately east of this property is an engine repair facility, the primary land use around Bri-sas’ property is residential; both the City’s Planning and Zoning Departments had recommended in favor of changing the land use designation of this property from Industrial and Medium Density Multifamily Residential to Restricted Commercial; the Restricted Commercial designation was “a logical designation of the property because of its proximity to residential neighborhoods”; and “[tjhose residential *250 properties would clearly be more detrimentally affected by industrial activities that may generate excessive amounts of noise, smoke, fumes, illumination, traffic, hazardous wastes, or negative visual impact, which are now authorized under the Industrial designation.”
The ALJ found that pursuant to the Miami River Master Plan this parcel of property was located in the middle river which extends from the 5th Avenue bridge west to Northwest 27th Avenue. The ALJ found no inconsistency between the amendment and Objective LU-1.3 because the concurrency analysis performed by the City’s expert staff proved that this project would not exceed minimum standards for level of service. The ALJ also found no inconsistency with Policy LU-1.3.6 which encourages diversification “in the mix of industrial and commercial activities and tenants through comprehensive marketing and promotion.” Rather, he found the mix of uses permitted under the Restricted Commercial classification to “promote” these goals.
Based on the concurrency review and analysis performed by the planning department and provided to the City Commission, the ALJ found no inconsistency with Policy LU-1.6.4 which requires FLUM amendments to undergo a concurrency review and recommendation by the planning department. In light of the City’s concurrency analysis, which included a traffic circulation component and Petitioners’ failure to introduce any competent evidence regarding traffic, the ALJ concluded that Petitioners had failed to sustain their burden of showing that Goal TR-1 and Policy TR-1.1.1 governing traffic had not been met. Similarly, the ALJ found that Petitioners failed to sustain their burden of demonstrating any inconsistency between this amendment and Goal CM-4, Objective CM-4.1, and Policy CM-4.1.5 governing public safety and protection within coastal zones from hurricanes, because Petitioners failed to introduce any evidence whatsoever on the subject of hurricanes. For the same reason — that is, failure to adduce any evidence whatsoever on the subject, the ALJ concluded that Petitioners failed to demonstrate any inconsistency between the amendment and Objective NR-1.3, governing maintenance of native species of fauna and flora, Objective NR-3.2, governing ambient air quality, Policy NR-3.2.1, governing traffic and ambient air quality, and Policy NR-3.2.3, governing increasing the quality of mass transit services within the City. To the contrary, the ALJ found elimination of uses authorized in an area designated as Industrial that involve “excessive amounts of noise, smoke, fumes ... [and] hazardous wastes,” to be consistent with these provisions.
Relying on the City’s concurrency analysis, the ALJ found no inconsistency with Objective PW-1.2 and Policy PW-1.2.1 governing availability of potable water. Since Petitioners introduced no evidence regarding levels of service for parks and open space, potable water transmission, sanitary sewer transmission capacity, storm water capacity, solid waste collection capacity, or traffic circulation, the ALJ concluded that no inconsistency with Policy CI-1.2.3 had been demonstrated.
With regard to the Port of Miami River sub-element, the ALJ concluded that no matter how defined,[4] neither this property *251 nor any other industrial property on the south side of the river in the immediate vicinity of Brisas’ property has ever functioned as a private shipping terminal and thus this sub-element did not apply. This conclusion notwithstanding, the ALJ expressly found that “Objective PA-3.1, and underlying Policies PA-3.1.1, 3.1.2, and 3.1.3, all relate to the purpose and scope of land development regulations — zoning— for the Port of Miami River and are therefore not relevant.”[5] The ALJ further concluded that “Objective PA-3.2 and underlying PA-3.2.1 pertain to coordination of surface transportation access to the Miami River with the traffic and mass transit system shown on the traffic circulation map series and are not germane to this amendment.”[6]
With regard to Goal PA-3,[7] the ALJ found no evidence to show that the amendment was inconsistent with the requirement that the City “encourage ” the Port of Miami River “to continue operation as a valued and economically viable component of the city’s maritime industrial base,” The ALJ found Captain Payne’s *252 testimony that land was needed for expansion of the marine industry and that the amendment would negatively impact the marine industry on the river insufficient to demonstrate an inconsistency with this goal especially since neither Captain Payne nor the Miami River Marine Group, Inc. attempted to purchase this property for industrial use. Significantly, the ALJ recognized that consistency does not require a local plan provision to “further,”— that is, to take action — to realize, every goal, objective, and policy of a plan. Rather, consistency requires only that the amendment does not conflict with other goals, objectives and policies.
The ALJ also found that the City complied with Policy PA-3.3 because it notified the Miami River Commission, which is the clearinghouse for all Miami River interests, of the Brisas application and that the Commission actually considered it. And although the Commission recommended against the amendment, the ALJ recognized that nothing in Objective PA-3.3 bound the City to this advisory recommendation.
The ALJ also rejected the notion that the amendment was not predicated on the best available, professionally acceptable data and analysis as required by Administrative Code Rule 9J-5.005 and section 163.3177 of the Florida Statutes. First, the ALJ rejected the notion that the City had to conduct a housing and industrial needs assessment before adopting this FLUM amendment because absent evidence to show that urban sprawl will result from the amendment, no such studies are necessary. Second, the ALJ noted that the City reviewed the data and analysis volume of the plan to determine whether this amendment was consistent with the plan; that it determined that the FLUM amendment would minimize land use conflicts in the area after considering the low density residential uses surrounding the property; that the property was not all designated Industrial, but also designated Medium Density Multifamily Residential in part, and that the two were mutually exclusive, making a change necessary for revitalization and redevelopment; that the City determined that a mixed use designation was more flexible for this area and was most appropriate to transition from industrial to residential; and that the City had considered adequate data provided by Brisas, the property survey, the deed, photographs of the property, the FLUM, and professional staff.
Based on the testimony presented and these findings, the ALJ found the amendment to be fairly debatable and recommended that the Department of Community Affairs enter a final order determining that the small scale development was in compliance.
Review By The Department
Petitioners filed a 23 page exception to this AL J’s decision, contesting virtually every finding and conclusion. The Department, following review of the entire record, rejected the identified exceptions, finding that most of these exceptions argued that the ALJ accepted the City’s evidence over Petitioners’ or that they re-argued matters repeatedly asserted before the ALJ, identified no legal basis for overturning the ALJ, or mischaracterized the nature of the Plan. The ALJ’s recommendations were accepted by the Department.
THE APPEAL TO THIS COURT
Petitioners, Appellants here, appealed the Department’s decision to this court raising essentially the same arguments raised in Balbino and Riverside, that (1) the Durham Park Neighborhood Association has standing; (2) the City did not prove that potable water was available; (3) that the City failed to conduct the analysis *253 required by the Comprehensive Plan related to hurricane evacuation and shelters; and, (4) the Port of Miami River sub-element applies to water dependent marine uses along the Miami River and not to just 14 companies.
Relying on our decisions in Balbino and Riverside, we reversed and remanded, holding that our reversals in those cases, both of which raised similar challenges to other parcels, required reversal of the instant decision:
Both the Final Order in DOAH Case No. 04-2754 and the Final Order in DOAH Case No. 06-759 were appealed and each appeal, including this one, has raised almost identical challenges. On August 8, 2007, we reversed the Final Order in DOAH Case No. 04-2754, and on August 29, 2007, we also reversed the Final Order in DOAH Case No. 06-759. See Payne v. City of Miami, 32 Fla. L. Weekly D1885, 2007 WL 2254570 (Fla. 3d DCA 2007) and Payne v. City of Miami, 32 Fla. L. Weekly D2055, 2007 WL 2428453 (Fla. 3d DCA 2007). Importantly, the ALJ in this case found the Final Orders in DOAH Case No. 04-2475 and DOAH Case No. 06-759 (which were reversed on appeal by this court) to be collateral estoppel in the instant action. Thus, we are compelled to reverse the order presently before us and remand for proceedings consistent with our opinions in those eases.
Reversed and remanded.
Durham Park Neighborhood Ass’n, Inc. v. City of Miami, 32 Fla. L. Weekly D2538, D2539, — So.3d-,-(Fla. 3d DCA Oct. 24, 2007) (footnote omitted).
For the same reasons stated in my dissents to denial of rehearing en banc in Balbino and Riverside — that is, that the administrative decisions on review were fully supported by both competent, substantial evidence and the law — I would grant rehearing or rehearing en banc in this case and affirm the decision of the Department, accepting the ALJ’s recommendations and finding this amendment “in compliance.” See Payne v. City of Miami, 32 Fla. L. Weekly D1885 (Fla. 3d DCA Aug. 8, 2007), substituted opinion issued Dec. 8, 2010, (Wells, J., dissenting from denial of rehearing en banc) (“Balbino ”), and Payne v. City of Miami, 32 Fla. L. Weekly D2055 (Fla. 3d DCA Aug. 29, 2007), substituted opinion issued Dec. 8, 2010, (Wells, J., dissenting from denial of rehearing en banc) (“Riverside ”).
GERSTEN, SHEPHERD and SUAREZ, JJ., concur.
Endnotes
’These dropped claims related to the following FLUM policies objectives and goals:
Policy LU-1.5.1: Development orders [:zoning regulations ] in the city will be consistent with the goals, objectives ad policies contained in the Natural Resource Conservation and Coastal Management elements of the Miami Comprehensive Neighborhood Plan.
Policy LU-1.6.5: The City will continue to use special district designations as a land development regulation instrument for the purpose of accomplishing specific development objectives in particular areas of the city.
Objective PA-3.3: The City of Miami shall coordinate its Port of Miami River planning activities with those of ports facilities providers and regulators including the U.S. Corps of Engineers, U.S. Coast Guard, and Miami-Dade County’s Port of Miami.
Goal CM-3: Provide an adequate supply of land for water dependent uses.
*254 Objective CM-3.1: Allow no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami.
Policy CM-3.1.1: Future land use and development regulations [zoning ordinances ] will encourage water dependent uses along the shoreline.
Objective LU-1.4: Continue the growth of Downtown Miami, expand its role as a center of domestic and international commerce, further its development as a regional center for the performing arts and other cultural and entertainment activities and develop an urban residential base.
Goal HO-2: Achieve a livable city center with a variety of urban housing types for persons of all income levels.
Objective HO-2.1: Achieve a livable downtown with a variety of urban housing types for persons of all income levels.
Policy TR-1.5.11: Through enforcement of applicable provisions of Section 14-182 “Transportation Control Measures” of the City Code, the City will seek to require new large-scale development to adopt and enforce measures that will reduce the generation of new single-occupant passenger car trips in areas of high-density development, and encourage the use of multiple-occupant vehicles, including public transit, for home-based work trips. The City will coordinate with the Downtown TMI and South Florida Commuter Services to provide support for transportation demand initiatives undertaken by new developments.
Policy NR-1.1.5: Regulate development on Virginia Key to ensure that there will be no net loss of functional wetlands; that beaches and dune systems on the island will not be degraded or disrupted; and that wildlife habitats and native species of fauna and flora will be protected.
Policy SS-1.3.3: Since the sanitary sewer network is an interconnected, county-wide system, the departments of Public Works and Planning will cooperate with Miami-Dade County WASA Department to jointly develop methodologies and procedures for biannually updating estimates of system demand and capacity.
Policy PW-1.1.1: Since the potable water network is an interconnected, countywide system, the City departments of Public Works and Planning will cooperate with Miami-Dade County WASA Department to jointly develop methodologies and procedures for biannually updating estimates of system demand and capacity, and ensure that sufficient capacity to serve development exists. (See Natural Resource Conservation Policy NR-2.1.4.)
" Goal LU-1: Maintain a land use pattern that (1) protects and enhances the quality of life in the city’s residential neighborhoods; (2) fosters redevelopment and revitalization of blighted or declining areas; (3) promotes and facilitates economic development and the growth of job opportunities in the city; ... (5) promotes the efficient use of land and minimizes land use contticts....
Policy LU-1.1.1: Development orders [zoning regulations ] authorizing new development or redevelopment that results in an increase in the density or intensity of land use shall be contingent upon the availability of public facilities and services that meet or exceed the minimum LOS standards adopted in the CIE.
Policy LU-1.1.2: The City’s Planning Department, with the assistance of various City departments and agencies, shall be responsible for monitoring the current and projected LOS provided by public facilities. The Planning Department shall perform the required concurrency review of proposed development for submittal to the *255 State Department of Community Affairs (DCA), as required by Florida statutes and administrative rules.
Policy LU-1.1.10: The City’s land development regulations [zoning ordinances ] will encourage high-density residential development and redevelopment in close proximity to Metrorail and Metromover stations, consistent with the Station Area Design and Development Plan for each station. (See Transportation Policy TR-1.5.2 and Housing Policy HO-1.1.9.)
Policy LU-1.1.11: The City hereby adopts designation of the City, excluding Virginia Key, Watson Island and the uninhabited islands of Biscayne Bay that have a land use and zoning classification of Conservation, as shown on “Attachment A,” as an Ui’ban Infill Area pursuant to Miami-Dade County’s designation of an Urban Infill Area lying generally east of the Palmetto Expressway and including all of the City of Miami. Within this area, the concentration and intensification of development around centers of activity shall be emphasized with the goals of enhancing the livability of residential neighborhoods and the viability of commercial areas. Priority will be given to infill development on vacant parcels, adaptive reuse of underutilized land and structures, and the redevelopment of substandard sites. Maintenance of transportation levels of service within this designated Urban Infill Transportation Concurrency Exception Area shall be in accordance with the adopted Transportation Corridors level of service standards set forth in Policies TR-1.1.2 and 1.1.3 of the Transportation Element of the MCNP.
Objective LU-1.2: Promote the redevelopment and revitalization of blighted, declining or threatened residential, commercial and industrial areas.
Objective LU-1.3: The City will continue to encourage commercial, office and industrial development within existing commercial, office and industrial areas; increase the utilization and enhance the physical character and appearance of existing buildings; and concentrate new commercial and industrial activity in areas where the capacity of existing public facilities can meet or exceed the minimum standards for Level of Service (LOS) adopted in the Capital Improvement Element (CIE).
Policy LU-1.3.6: The City will continue to encourage a diversification in the mix of industrial and commercial activities and tenants through strategic and comprehensive marketing and promotion efforts so that the local economy is buffered from national and international cycles. Particular emphasis is on, but not limited to, Southeast Overtown/Park West, Latin Quarter, Little Haiti, Little River Industrial District, River Corridor, the Garment District and the Omni area.
Objective LU-1.5: Land development regulations [zoning ordinances ] will protect the city’s unique natural and coastal resources, and its historic and cultural heritage.
Objective LU-1.6: Regulate the development or redevelopment of real property within the city to insure consistency with the goals, objectives and policies of the Comprehensive Plan.
Policy LU-1.6.1: The “Interpretation of the Future Land Use Plan Map” section of this element, which follows these land use goals, objectives and policies, establishes the activities and facilities allowed within each land use category appearing on the Future Land Use Plan Map, and the City’s land development regulations shall be consistent with this section of the Miami Comprehensive Neighborhood Plan.
Policy LU-1.6.4: Any proposal to amend the City’s zoning ordinance that has been deemed to require an amendment to the *256 Future Land Use Plan Map by the Planning Department, shall require a concurrency review and a finding from the Planning Department that the proposed amendment will not result in a LOS that falls below the adopted minimum standards, and will not be in conflict with any element of the Miami Comprehensive Neighborhood Plan. Based on its evaluation, and on other relevant planning considerations, the Planning Department will forward a recommended action on said amendment to the Planning Advisory Board, which will then forward its recommendation to the City Commission.
Goal PA-3: The Port of Miami River, a group of privately owned and operated commercial shipping companies located at specific sites along the Miami River, shall be encouraged to continue operation as a valued and economically viable component of the city’s maritime industrial base.
Objective PA-3.1: The City of Miami, through its Land development regulations [jzoning ordinances ], shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and shall regulate its expansion and redevelopment in coordination with the City’s applicable coastal management and conservation plans and policies. [The “Port of Miami River” is simply a legal name used to identify some 14 independent, privately-owned small shipping companies located along the Miami River, and is not a “Port Facility” within the usual meaning of the term. The identification of these shipping concerns as the “Port of Miami River” was made in 1986 for the sole purpose of satisfying a U.S. Coast Guard regulation governing bilge pump outs].
Policy PA-3.1.1: The City shall use its land development regulations [zoning ordinances ] to encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses.
Policy PA-3.1.2: The City shall, through its land development regulations [zoning ordinances ], encourage the development and expansion of the Port of Miami River consistent with the coastal management and conservation elements of the City’s Comprehensive Plan.
Policy PA-3.1.3: The City shall, through its land development regulations [zoning ordinances ], encourage development of compatible land uses in the vicinity of the Port of Miami River so as to mitigate potential adverse impacts arising from the Port of Miami River upon adjacent natural resources and land uses.
Objective PA-3.2: The City of Miami shall coordinate the surface transportation access to the Port of Miami River with the traffic and mass ti'ansit system shown on the traffic circulation map series.
Policy PA-3.2.1: The City of Miami shall, through the Transportation Element of the Comprehensive Plan, coordinate intermo-dal surface and water transportation access serving the Port of Miami River.
Objective PA-3.3: The City of Miami shall coordinate its Port of Miami River planning activities with those of ports facilities providers and regulators including the U.S. Corps of Engineers, U.S. Coast Guard, and Miami-Dade County’s Port of Miami.
Policy HO-1.1.9: The City’s land development regulations [zoning ordinances ] will encourage high-density residential development and redevelopment in close proximity to Metrorail and Metromover stations, consistent with the Station Area Design and Development Plan for each *257 station. (See Land Use Policy LU-1.1.10 and Transportation Policy TR-1.5.2.)
Policy HO-2.1.4: The City will continue to promote development of new, high quality, dense urban neighborhoods along the Miami River, in Central Brickell and in Southeast Overtown/Park West through Special District (SD) zoning.
Goal TR-1: Maintain an effective and cost efficient traffic circulation network within the City of Miami that provides transportation for all persons and facilitates commercial activity, and which is consistent with, and furthers, neighborhood plans, supports economic development, conserves energy, and protects and enhances the natural environment.
Policy TR-1.1.1: The City hereby adopts designation of the City, excluding Virginia Key, Watson Island and the uninhabited islands of Biscayne Bay that have a land use and zoning classification of Conservation, as an Urban Infill Area pursuant to Miami-Dade County’s designation of an Urban Infill Area lying generally east of the Palmetto Expressway and including all of the City of Miami. Within this area, the concentration and intensification of development around centers of activity shall be emphasized with the goals of enhancing the livability of residential neighborhoods and the viability of commercial areas. Priority will be given to infill development on vacant parcels, adaptive reuse of underutilized land and structures, and the redevelopment of substandard sites. Maintenance of transportation levels of service within this designated Urban Infill Transportation Concurrency Exception Area shall be in accordance with the adopted Transportation Corridors level of service standards set forth in Policies TR-1.1.2 and TR-1.1.3 of the Transportation Element of the MCNP. (See Land Use Policy LU-1.1.11.)
Policy TR-1.5.10: Through application of the provisions of its land development regulations [zoning ordinances ], the City shall encourage residential development near large employment centers in order to minimize Commutes within the City and near the large employment centers. The City shall continue to update the land development regulations, as necessary, to ensure the regulations promote residential development near large employment centers and investigate opportunities for mixed-use developments.
Objective NR-1.3: Maintain and enhance the status of native species of fauna and flora.
Objective NR-3.2: Prevent the degradation of ambient air quality within the city.
Policy NR-3.2.1: Establish vehicular transportation patterns that reduce the concentration of pollutants in areas known to have ambient air quality problems.
Policy NR-3.2.2: Support those elements of the Miami-Dade Comprehensive Development Master Plan that encourage the use of Metrorail and Metromover by directing high density new development or redevelopment first to areas nearest Me-trorail and Metromover stations, and those land use policies that do not foster the proliferation of employment centers in the suburban areas of the county. (See Transportation Objective TR-1.5 and associated policies.)
Policy NR-3.2.3: Work with the County transportation planning agencies to continue to increase the quality of mass transit services within the city.
Goal CM-4: Ensure public safety and the protection of property within the coastal zone from the threat of hurricanes:
*258 Objective CM-4.1: Minimize the potential for loss of human life and the destruction of property from hurricanes.
Policy CM-4.1.5: Each proposed land use and land development regulation change within the Coastal High Hazard area of the city will require an analysis of its potential impact on evacuation times and shelter needs in the event of a hurricane.
Objective PW-1.2: Ensure adequate levels of safe potable water are available to meet the needs of the city. (See Natural Resource Conservation Objective NR-2.1.)
Policy PW-1.2.1: Ensure potable water supplies meet the established level of service standards for transmission capacity of 200 gallons per capita per day (GPCD). (See Natural Resource Conservation Policy NR-2.1.5 and Capital Improvements Policy CI-1.2.3.)
Policy CI-1.2.3: Acceptable Level of Service Standards for public facilities in the City of Miami are: a) Recreation and Open Space — 1.3 acres of public park space per 1000 residents, b) Potable Water Transmission Capacity — 200 gallons/resi-deni/day. (See Potable Water Policy PW-1.2.1 and Natural Resource Conservation Policy NR-2.1.5.). c) Sanitary Sewer Transmission Capacity — 100 gallons/resident/day. d) Storm Sewer Capacity — Issuance of any development permit shall require compliance with a drainage level of service standard of a one-in-five-year storm event. For the storm drainage system as a whole, 20 percent of the existing system will be brought to a standard of a one-in-five-year storm event by 2000. e) Solid Waste Collection Capacity — 1.28 tons/resident/year, f) Traffic Circulation— The minimum level of service standard on limited access, arterial, and collector roadways that are not within designated Transportation Corridors is LOS E, with allowable exceptions and justifications therefore, with LOS measured by conventional V/C methodology. Within designated Transportation Corridors, which include approximately 95% of the roadway mileage within the City of Miami, a minimum LOS E is also maintained, but the measurement methodology is based on peak-hour person-trips wherein the capacities of all modes, including mass transit, are used in calculating the LOS. Specific levels of service by location and mode are set out in Policies 1.1.2 and 1.1.3 of the Transportation Policies in the Miami Comprehensive Neighborhood Plan 1989-2000.

. The opinion which follows contains both footnotes, as indicated by Arabic numerals (1, etc.), and endnotes, as indicated by Roman numerals (i, etc.).

. The parties rely upon the August 2004 version of the Miami Comprehensive Neighborhood Plan, which has been quoted extensively herein.

. This section provides:
(1)Amendments to comprehensive plans adopted pursuant to this part may be made not more than two times during any calendar year, except:
[[Image here]]
(c) Any local government plan amendments directly related to proposed small scale development activities.... A small scale development amendment may be adopted only under the following conditions:
1. The proposed amendment involves a use of 10 acres or fewer and:
a.The cumulative annual effect of the acreage for all small scale development amendments adopted by the local government shall not exceed:
(I) A maximum of 120 acres in a local government that contains areas specifically designated in the local comprehensive plan for urban infill, urban redevelopment, or downtown revitalization....
(II) A maximum of 80 acres in a local government that does not contain any of the designated areas set forth in sub-sub-sub-paragraph (I).
(III) A maximum of 120 acres in a county established pursuant to s. 9, Art. VIII of the State Constitution.
b. The proposed amendment does not involve the same property granted a change within the prior 12 months.
c. The proposed amendment does not involve the same owner's property within 200 *248 feet of property granted a change within the prior 12 months.
d. The proposed amendment does not involve a text change to the goals, policies, and objectives of the local government’s comprehensive plan, but only proposes a land use change to the future land use map for a site-specific small scale development activity.
e. The property that is the subject of the proposed amendment is not located within an area of critical state concern, unless the project ... involves the construction of affordable housing units....
f.If the proposed amendment involves a residential land use, the residential land use has a density of 10 units or less per acre, except that this limitation does not apply to small scale amendments ... that are designated in the local comprehensive plan for urban infill....
§ 163.3187(l)(c)la-f, Fla. Stat. (2004).

. The Port of Miami River sub-element defines the term "port” as used in that sub-element as:
simply a legal name used to identify some 14 independent, privately-owned small shipping companies located along the Miami River, and ... not a 'Port Facility’ with *251 in the usual meaning of the term. The identification of these shipping concerns as the 'Port of Miami River’ was made in 1986 for the sole purpose of satisfying a U.S. Coast Guard regulation governing bilge pump outs.
Miami Comprehensive Neighborhood Plan, Volume I, Port of Miami River sub-element, n. 1.
In Payne v. City of Miami, 927 So.2d 904, 908 (Fla. 3d DCA 2006) ("Payne II’’), this court concluded, in an appeal dealing exclusively with standing to bring suit in circuit court to challenge a zoning decision, that "the ‘Port of Miami River’ subsection is not limited to 14 unidentified companies. Rather, the footnote [to the Port of Miami River sub-element] explains that the 'Port of Miami River’ is not a port in the traditional sense of the word.”

. This Objective and its policies provide:
Objective PA-3.1: The City of Miami, through its Land development regulations [zoning regulations], shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and shall regulate its expansion and redevelopment in coordination with the City's applicable coastal management and conservation plans and policies.
Policy PA-3.1.1: The City shall use its land development regulations [zoning regulations] to encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses.
Policy PA-3.1.2: The City shall, through its land development regulations [zoning regulations], encourage the development and expansion of the Port of Miami River consistent with the coastal management and conservation elements of the City’s Comprehensive Plan.
Policy PA-3.1.3: The City shall, through its land development regulations [zoning regulations], encourage development of compatible land uses in the vicinity of the Port of Miami River so as to mitigate potential adverse impacts arising from the Port of Miami River upon adjacent natural resources and land uses.

. This Objective and Policy provide:
Objective PA-3.2: The City of Miami shall coordinate the surface transportation access to the Port of Miami River with the traffic and mass transit system shown on the traffic circulation map series.
Policy PA-3.2.1: The City of Miami shall, through the Transportation Element of the Comprehensive Plan, coordinate intermo-dal surface and water transportation access serving the Port of Miami River.

. This Goal and objective provide:
Goal PA-3: The Port of Miami River, a group of privately owned and operated commercial shipping companies located at specific sites along the Miami River, shall be encouraged to continue operation as a valued and economically viable component of the city’s maritime industrial base.
Objective PA-3.3: The City of Miami shall coordinate its Port of Miami River planning activities with those of ports facilities providers and regulators including the U.S. Corps of Engineers, U.S. Coast Guard, and Miami-Dade County’s Port of Miami.